# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### June 4, 2008 Session

## STATE OF TENNESSEE v. DEVIN BANKS

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 03-01956    Joseph B. Dailey, Judge**

---

**No. W2005-02213-SC-DDT-DD - Filed November 7, 2008**

---

This appeal involves a defendant who shot two persons during a robbery at the home of one of the victims. One of the victims died. A Shelby County grand jury indicted the defendant for (1) premeditated and intentional murder, (2) murder during the perpetration of a robbery, (3) attempted first degree murder, and (4) especially aggravated robbery. A jury found the defendant guilty on all counts. At the penalty phase of the trial, the jury found the presence of the aggravating circumstances in Tenn. Code Ann. § 39-13-204(i)(6) and (7) (2006) and sentenced the defendant to death. In a separate sentencing hearing, the trial court sentenced the defendant to twenty-five years for the attempted first degree murder and especially aggravated robbery convictions and ordered these sentences to be served consecutively to each other and to the sentence of death. The defendant appealed his convictions and sentences to the Court of Criminal Appeals. The Court of Criminal Appeals, after concluding that the trial court's submission of the Tenn. Code Ann. § 39-13-204(i)(6) aggravating circumstance to the jury was harmless error, affirmed the defendant's convictions and the sentences. *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039 (Tenn. Crim. App. July 6, 2007).

We have concluded that the Court of Criminal Appeals erred by holding that the evidence did not support submitting the Tenn. Code Ann. § 39-13-204(i)(6) aggravating circumstance to the jury. We also hold as follows: (1) the trial court committed no errors with regard to the admission or exclusion of evidence, (2) the trial court did not err with regard to its handling of the Arabic language interpreter or the dismissal of one of the jurors, (3) the prosecutor's closing arguments did not result in reversible error, (4) the trial court did not commit reversible error with regard to the instructions for lesser-included offenses, (5) the evidence supports the defendant's convictions for attempted first degree murder and especially aggravated robbery, (6) the sentences of attempted first degree murder and especially aggravated robbery are not excessive, and the trial court did not err by ordering them to be served consecutively, (7) the evidence supports the defendant's first degree murder convictions, as well as the jury's finding that the Tenn. Code Ann. § 39-13-204(i)(6) and (7) aggravating circumstances apply in this case, (8) the defendant's multiple constitutional challenges to Tennessee's death penalty procedures are without merit, and (9) the defendant's constitutional challenge to Tennessee's lethal injection protocol is without merit. We also agree with the Court of Criminal Appeals's conclusion with respect to the remaining issues and attach to this opinion as an appendix the relevant portions of that court's opinion. Finally, in the discharge of our obligation under Tenn. Code Ann. § 39-13-306 (2006), we have thoroughly reviewed the record in this case and

have determined (1) that the defendant's death sentence was not imposed in an arbitrary fashion, (2) that the evidence fully supports the aggravating circumstances in Tenn. Code Ann. § 39-3-204(i)(6) and (7), (3) that these aggravating circumstances outweigh the mitigating circumstances offered by the defendant, and (4) that the defendant's death sentence, taking into consideration the nature of the offenses and the defendant himself, is neither excessive nor disproportionate to the penalties imposed in similar cases. Accordingly, the judgment of the Court of Criminal Appeals, as corrected by this opinion, is affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1) (2006); Judgment of the Court of Criminal Appeals Reversed in Part and Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., WILLIAM M. BARKER, CORNELIA A. CLARK, and GARY R. WADE, JJ., joined.

Robert Jones, Shelby County Public Defender; Phyllis Aluko and Tony N. Brayton, Assistant Public Defenders (on appeal); Kathy Kent and Latonya Burrow, Assistant Public Defenders (at trial); Memphis, Tennessee, for the appellant, Devin Banks.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Senior Counsel; Clarence Lutz, Assistant Attorney General (on appeal); William L. Gibbons, District Attorney General; Stacy McEndree and Karen Cook, Assistant District Attorneys General (at trial); Memphis, Tennessee, for the appellee, State of Tennessee.

**OPINION**

**I.**

**THE CRIME, ARREST, AND INVESTIGATION**

Kadhem Al-Maily and Hussain Atilebawi immigrated to the United States from Iraq and eventually settled in Memphis, Tennessee. They were acquainted with each other in their home country, and they became close friends in Memphis because neither of their families had accompanied them to the United States. Mr. Al-Maily, who was called "Uncle" by those who knew him, was widely known and respected among the Iraqi community in Memphis because he had a reputation of helping persons in need and of making everybody happy.[1] When Mr. Atilebawi first moved to Memphis, he worked in a grocery store. Later, he operated a body shop and also ran several other businesses out of his home, including selling used automobiles and men's clothing.

After they moved to Memphis, both Mr. Al-Maily and Mr. Atilebawi befriended Devin Banks, who lived near Mr. Atilebawi. Mr. Banks, whose nickname was "Boo," was much younger than Mr. Al-Maily and Mr. Atilebawi. Mr. Atilebawi was very generous to Mr. Banks. He would hire Mr. Banks to perform "odd jobs," such as constructing a fence around his house. Mr. Atilebawi

---

[1] Mary Hughes, Mr. Atilebawi's girlfriend and caretaker, explained that Mr. Al-Maily was nicknamed "Uncle" "[b]ecause he was . . . the Uncle of the whole group. If they needed something, he'll help them. He was a real good guy like that. If you're hungry, he'll . . . get you something to eat . . . . [H]e was a real good person."

-2-

also sold several used cars to Mr. Banks on very favorable terms. Mr. Banks was welcome in Mr. Atilebawi's home, and he occasionally spent the night at Mr. Atilebawi's house.

By September 2002, the relationship between Mr. Banks and Mr. Atilebawi had changed, at least from Mr. Banks's point of view. Mr. Banks was apparently upset about an incident that had occurred one year earlier involving a former girlfriend,[2] and he also believed that Mr. Atilebawi had cheated him out of a large sum of money.[3] On Thursday, September 12, 2002, he told his friend, Michael Hilliard, that he "wanted to pay [Mr. Atilebawi] back." Mr. Banks asked Mr. Hilliard to obtain a handgun for him and to assist him in killing Mr. Atilebawi. The two men discussed dumping Mr. Atilebawi's body in the Wolf River to avoid detection.

Around 11:00 p.m. on Sunday, September 15, 2002, Mr. Banks drove his white Ford Explorer to Sherry Tomason's house to drop off her son. Ms. Tomason lived near Mr. Banks's brother's house where Mr. Banks was staying. The Explorer had a flat tire, and Ms. Tomason gave Mr. Banks permission to leave the vehicle in her yard. She also offered to give Mr. Banks a ride, but Mr. Banks told her that he was going to see the man who had sold him the vehicle and that this man lived nearby. Ms. Tomason noted that it seemed to be late in the evening to do that, but Mr. Banks was insistent.

After leaving Ms. Tomason's house, Mr. Banks met up with Mr. Hilliard, and the two men proceeded to Mr. Atilebawi's house. Mr. Banks was armed with a .22 caliber semi-automatic pistol provided by Mr. Hilliard. They decided that Mr. Banks would arrive at Mr. Atilebawi's house alone and that Mr. Hilliard would wait for a telephone call from Mr. Banks summoning him to Mr. Atilebawi's house.

That same evening, Mr. Al-Maily was visiting Mr. Atilebawi. The two men were engaged in conversation and watching television when Mr. Banks arrived at Mr. Atilebawi's front door between midnight and 2:00 a.m. on the morning of September 16, 2002. Mr. Atilebawi welcomed Mr. Banks into his home, and Mr. Banks was surprised when he saw Mr. Al-Maily sitting in Mr. Atilebawi's living room. Mr. Banks and Mr. Atilebawi talked awhile, and their "general conversation" touched on Mr. Banks's belief that Mr. Atilebawi owed him money and on Mr. Banks's relationship with Ms. Thompson. At some point during the conversation, Mr. Banks asked permission to use Mr. Atilebawi's cordless telephone and stepped outside to call Mr. Hilliard.

---

[2]Mr. Banks was dating Sondra Thompson in September 2001. One night, during a visit to Mr. Atilebawi's home, Mr. Banks, Ms. Thompson, and Mr. Atilebawi fell asleep in Mr. Atilebawi's living room. All of them ended up spending the night in the living room. When she awoke, Ms. Thompson discovered that the side of the shorts she was wearing had been cut while she was sleeping, and she decided that Mr. Atilebawi must have done it. When Mr. Banks awakened, Ms. Thompson showed him her shorts and told him that she thought Mr. Atilebawi had cut them. Mr. Banks did not appear to be surprised or concerned. He simply continued walking Ms. Thompson to her car and then returned to the house to go back to sleep. The police were never called, and, at least as far as this record shows, Mr. Banks never confronted Mr. Atilebawi about the incident. Ms. Thompson broke up with Mr. Banks in December 2001 because of the verbal and physical abuse she received from Mr. Banks.

[3]The record contains little evidence regarding how Mr. Atilebawi had allegedly cheated Mr. Banks.

-3-

Mr. Atilebawi thought that Mr. Banks was acting suspiciously. He joined Mr. Banks outside because he wanted to check on the used vehicles that were parked in the front of his house. Mr. Atilebawi walked down his driveway to inspect the vehicles, and, as he turned around to walk back to the house, Mr. Banks shot him with the .22 caliber pistol. After Mr. Atilebawi fell to the driveway, Mr. Banks shot him three more times. Two bullets struck Mr. Atilebawi in the head, one in the shoulder, and one in the leg. Mr. Atilebawi was bleeding profusely, and it became difficult for Mr. Atilebawi to see because his eyes were covered with blood.

Mr. Banks tried to drag Mr. Atilebawi's body from the driveway but was unable to move Mr. Atilebawi because he was too heavy. Mr. Banks later confessed, "I was scared and didn't want nobody to see him," and "I tried to pull him away but he was too heavy for me to move." He left Mr. Atilebawi in the driveway and returned to the house. Despite the blood covering his face, Mr. Atilebawi saw Mr. Banks enter his house. He was also able to faintly see another person with Mr. Banks. This person was Mr. Hilliard who, by that time, had joined Mr. Banks.

When Mr. Banks re-entered Mr. Atilebawi's house, he confronted Mr. Al-Maily. Mr. Al-Maily turned over three hundred dollars in cash to Mr. Banks. Mr. Banks then ordered Mr. Al-Maily into Mr. Atilebawi's bedroom and commanded him to lie face down on the floor. Mr. Al-Maily complied. Messrs. Banks and Hilliard then began rummaging through Mr. Atilebawi's bedroom and living room looking for items to steal. Eventually, they decided to steal a red Jeep Cherokee and a Chevrolet Caprice from among the cars in the front yard. They loaded audio speakers and many shirts and hats in their original packaging into the Jeep. Mr. Banks also pocketed several thousand dollars in cash. The cash – mostly one hundred dollar bills and possibly in excess of six thousand dollars – was the proceeds from the sale of one of Mr. Atilebawi's used cars.

After all the stolen property had been loaded into the Jeep, Mr. Banks re-entered Mr. Atilebawi's house, and walked through the living room and the short hallway to the bedroom where Mr. Al-Maily was still lying face-down on the floor. Mr. Al-Maily had cooperated fully with Mr. Atilebawi during the robbery. He had not interfered or resisted in any way, and he had quickly surrendered all the cash he had with him to Mr. Banks.

Nonetheless, Mr. Banks drew his .22 caliber pistol, placed it not more than twenty-four inches from Mr. Al-Maily's head, and shot him behind the right ear. The bullet ricocheted into the left portion of Mr. Al-Maily's brain. The force of the gunshot caused Mr. Al-Maily to vomit reflexively, and Mr. Banks watched the blood and vomit flow from Mr. Al-Maily's mouth. Mr. Banks walked out of the house and returned the pistol to Mr. Hilliard. Messrs. Banks and Hilliard then left the scene, Mr. Banks driving the red Jeep and Mr. Hilliard driving the Chevrolet Caprice. They later abandoned the Caprice at an apartment complex, and Mr. Banks drove Mr. Hilliard home in the red Jeep.

Mr. Atilebawi continued to lie bleeding in the driveway where he had fallen after Messrs. Banks and Hilliard entered his house. He did not dare move because he was afraid that he would attract Mr. Banks's attention and that Mr. Banks would shoot him again. Mr. Banks later stated that he thought Mr. Atilebawi was still alive when he left because he heard Mr. Atilebawi call his nickname, "Boo."

After dropping off Mr. Hilliard, Mr. Banks picked up his brother in the stolen red Jeep and went on an early morning shopping spree with the money he had taken from Mr. Atilebawi. He purchased men's clothing at a nearby K-Mart store, a camera and some hair products at a nearby Walgreens drug store, and some brake pads and an air freshener for the white Ford Explorer at an Auto Zone store. Along the way, Mr. Banks and his brother stopped for breakfast at a Waffle House, and Mr. Banks even picked up an employment application at Walgreens. Mr. Banks brought his brother home at approximately 6:30 a.m.

At approximately 7:00 a.m., Mr. Banks drove the red Jeep to Ms. Tomason's house. Before driving Ms. Tomason's son to school, he talked with Ms. Tomason awhile and retrieved a compact disc from his Ford Explorer that was still parked in her front yard. After dropping off Ms. Tomason's son at school, Mr. Banks drove to Maco Tires and Auto Care where he purchased custom rims and new tires for the Jeep for approximately $1,500. Mr. Banks paid cash, and the manager remembered that he "pulled out quite a bit of money and . . . started peeling off one hundred dollar bills."

When the manager put the old rims and tires in the back of the Jeep, he noticed a significant amount of matching shirts and hats in their original packaging. When he asked Mr. Banks about the clothing, Mr. Banks told the manager that he sold clothing and that he had just returned from St. Louis. Mr. Banks sold the manager two sets of matching shirts and hats for ten dollars each.

In the meantime, despite multiple gunshot wounds and significant blood loss, Mr. Atilebawi managed to drag himself to the telephone in his house. He was apparently able to press the redial button on the telephone and connect with a friend in Detroit, Michigan. What Mr. Atilebawi told his friend in Detroit is unclear. However, that call prompted Mr. Atilebawi's friend to call some of Mr. Atilebawi's friends in Tennessee, including Mohammed Al-Burkart and Aadel Alkhafaji. Mr. Al-Burkart and his wife drove to Mr. Atilebawi's house and telephoned the police as soon as they saw what had taken place.

Officer Steven Jones was the first officer to arrive at Mr. Atilebawi's house at approximately 7:00 a.m. He found Mr. Atilebawi lying in a pool of blood on a sofa in the living room and observed that there was blood all over the living room. Even though Mr. Atilebawi was disoriented and dazed, he told Officer Jones what had happened and identified "Boo" as the person who had shot him. He described "Boo" as an African-American male in his late teens or early twenties. Mr. Atilebawi also told Officer Jones that "Uncle" was in the other room. Officer Jones then discovered Mr. Al-Maily dead in the bedroom. Officer Jones summoned medical assistance, crime scene investigators, and homicide detectives to the scene. The emergency medical responders arrived at Mr. Atilebawi's house a short time later.

The officers at the scene began to interview neighbors to learn who "Boo" was. They learned quickly that "Boo" was Mr. Banks's nickname and that they should be on the lookout for a red Jeep. Sergeant Mark Miller was in the neighborhood following up on these leads when he saw a Jeep

matching the description of the Jeep stolen from Mr. Atilebawi traveling in his direction.[4] When the Jeep made an abrupt turn and headed down another street, Sergeant Miller gave chase and stopped the Jeep. When Sergeant Miller ascertained that Mr. Banks was driving the Jeep, he placed Mr. Banks under arrest at approximately 9:30 a.m. During his search of Mr. Banks and the Jeep, Sergeant Miller found $1,253 in cash (including ten one hundred dollar bills), the stolen clothing and audio speakers, and the receipts for the purchases Mr. Banks had made during the shopping spree with his brother.

Mr. Banks did not appear to be injured when he was arrested. He acted in a lackadaisical manner and said nothing at the scene of the arrest. Mr. Banks was transported to the Homicide Office of the Memphis Police Department, and the Jeep was impounded. At 1:42 p.m., Sergeant Miller and Lieutenant Michael Williams advised Mr. Banks of his *Miranda* rights, and Mr. Banks signed a written waiver of his rights and gave the first of two confessions.

In his first confession, Mr. Banks admitted that he was present at Mr. Atilebawi's house when Mr. Atilebawi was shot, but he claimed that a man named Brian Winters had shot Mr. Atilebawi. Mr. Banks confessed that he had stolen the red Jeep, the clothing, and the audio speakers. He also confessed that he had tried to hide Mr. Atilebawi's body. In addition, he stated that he and Mr. Atilebawi had discussed his belief that Mr. Atilebawi owed him money and his belief that Mr. Atilebawi had molested Ms. Thompson in September 2001.

Following Mr. Banks's first confession, the authorities arrested Mr. Winters at his house and also recovered a .25 caliber pistol and a .22 caliber pistol that later proved to be the pistol that shot both Messrs. Atilebawi and Al-Maily. Coincidently, Mr. Hilliard was at Mr. Winters's residence when Mr. Winters was arrested, but he was not a person of interest to the authorities at that time. Once in custody, Mr. Winters denied that he had been involved with the shootings or the robbery at Mr. Atilebawi's house and provided the authorities with the names and telephone numbers of several alibi witnesses.

On September 17, 2002, while in the process of confirming Mr. Winters's alibi, Sergeant Miller talked with both Mr. Winters's girlfriend and Mr. Hilliard on the telephone. He asked Mr. Hilliard to come down to the police station to give a statement regarding Mr. Winters's whereabouts when the crimes were committed.
When Mr. Hilliard stated that he had no means of transportation, Sergeant Miller offered to send a car for him. When Mr. Hilliard arrived at the police station, he gave Sergeant Miller what he believed to be an owner's manual for a Jennings .22 caliber semi-automatic pistol.

The same day, after Mr. Banks told the authorities that he wanted to recant portions of the confession he had given to Sergeant Miller and Lieutenant Williams on September 16, 2002, Sergeant James L. Fitzpatrick obtained a second confession from Mr. Banks. Mr. Banks was brought back to the Homicide Office, and Sergeant Fitzpatrick again informed Mr. Banks of his *Miranda* rights and obtained a signed written waiver of these rights on September 17, 2002, at 4:05

---

[4]Mr. Banks was on his way from Maco Tires and Auto Care to his brother's house to get some sleep when he was spotted by Officer Miller.

p.m. Mr. Banks then gave a second confession which was reduced to writing. Mr. Banks was given an opportunity to review and to correct his written confession. He made no changes and then initialed each page and signed the confession at 5:06 p.m.

In his second confession, Mr. Banks admitted that he had shot Mr. Al-Maily and Mr. Atilebawi with a black .22 or .25 caliber automatic pistol that belonged to Mr. Hilliard. He stated that he obtained the pistol from Mr. Hilliard on Sunday night before he went to Mr. Atilebawi's house. He told Sergeant Fitzpatrick that he shot Mr. Atilebawi in revenge for Mr. Atilebawi's cheating him out of a large sum of money and because of the September 2001 incident involving Ms. Thompson. Mr. Banks admitted that he had explained to Mr. Hilliard three days before the shooting why he wanted the pistol and that at that time they had discussed disposing of Mr. Atilebawi's body in the Wolf River.

Mr. Banks provided the details of the crime during his second confession. He admitted arriving at Mr. Atilebawi's house alone early on the morning of September 16, 2002. He stated that he engaged Mr. Atilebawi in conversation and then called Mr. Hilliard to come to Mr. Atilebawi's house. He admitted that he shot Mr. Atilebawi. He admitted robbing Mr. Al-Maily and Mr. Atilebawi and taking more than three thousand dollars in cash, two automobiles, men's clothing, and audio speakers. Finally, he admitted returning to the house and executing Mr. Al-Maily after he and Mr. Hilliard had filled the Jeep with stolen property.

The fact that Mr. Banks remained in the area after shooting Messrs. Al-Maily and Atilebawi prompted Sergeant Fitzpatrick to ask Mr. Banks about his shopping spree immediately after he committed the crimes. When Sergeant Fitzpatrick asked him why he had purchased new rims and tires for the Jeep, Mr. Banks stated simply, "I figured that I would keep the Jeep." He offered no explanation for picking up the job application at Walgreens.

The two head wounds that Mr. Atilebawi received at the hands of Mr. Banks were devastating and serious. Bullet and bone fragments were surgically removed from Mr. Atilebawi's brain, and surgeons were required to remove a portion of Mr. Atilebawi's temporal lobe that controls speech, memory, and personality. As a result of his injuries, Mr. Atilebawi was rendered susceptible to seizures and was left with cognitive problems, which manifest themselves in the form of speech difficulties and memory problems. Mr. Atilebawi was hospitalized for approximately one month. When he returned home, he discovered that property with an estimated value of forty thousand dollars had been stolen, including his furniture, a stereo, and a big screen television.

## II.
### THE INDICTMENT AND TRIAL

In March 2003, a grand jury in Shelby County returned a four-count indictment against Mr. Banks. The indictment charged Mr. Banks with (1) the premeditated and intentional killing of Mr.

Al-Maily;[5] (2) the killing of Mr. Al-Maily in the perpetration of robbery;[6] (3) the attempted first degree murder of Mr. Atilebawi;[7] and (4) the especially aggravated armed robbery of property over the value of ten thousand dollars from Mr. Atilebawi.[8]

One month later, on April 7, 2003, Mr. Banks filed a motion to require the State of Tennessee to announce whether it intended to seek the death penalty or another enhanced punishment. On April 10, 2003, the State announced its intention to seek the death penalty. In accordance with Tenn. R. Crim. P. 12.3, the State also notified Mr. Banks that it intended to rely upon the following two aggravating circumstances: first, that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution,[9] and second, that the murder was committed while Mr. Banks was engaging in committing a first degree murder or robbery.[10]

Mr. Banks's trial began on April 4, 2005. After three days of voir dire, the State presented numerous witnesses over the course of three days of testimony. These witnesses included Mr. Atilebawi, the neurologist who treated Mr. Atilebawi, neighbors and friends who knew the parties, the police officers and forensic witnesses who had been involved in the investigation, the pathologist who performed Mr. Al-Maily's autopsy, and the store manager from whom Mr. Banks had purchased the rims and tires for the Jeep. After Mr. Banks indicated that he did not desire to testify, the defense rested without presenting any evidence. The jury began its deliberations on Friday, April 8, 2005, and on Saturday, April 9, 2005, returned a verdict finding Mr. Banks guilty on all four counts of the indictment.

The penalty phase of the trial began on Saturday, April 9, 2005, after the guilt phase of the trial concluded. The State called Mr. Atilebawi and his partner, Mary Hughes, to testify regarding the impact of Mr. Banks's crimes on the victims. Mr. Banks did not testify during the punishment phase; however, he called eleven mitigation witnesses. These witnesses presented a positive and sympathetic image of Mr. Banks. The implicit, and at times explicit, undercurrent of their testimony was the youth of Mr. Banks who was only nineteen years old when he murdered Mr. Al-Maily.

Five employees of the Office of the Shelby County Sheriff testified about his conduct in prison and his efforts to rehabilitate himself. They described Mr. Banks as a model prisoner who had two minor blemishes on his disciplinary record and reported that he had participated in programs involving religious studies, anger management, drug and alcohol abuse, and other skills programs. Three members of the Leewood Baptist Church also testified about Mr. Banks's commitment to his church and his church-related activities. Several of these witnesses expressed disbelief that Mr.

---

[5] Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2002).

[6] Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2002).

[7] Tenn. Code Ann. § 39-12-101 (1997).

[8] Tenn. Code Ann. § 39-13-403(a) (1997).

[9] Tenn. Code Ann. § 39-13-204(i)(6) (Supp. 2002).

[10] Tenn. Code Ann. § 39-13-204(i)(7) (Supp. 2002).

Banks could have committed the crimes for which he had been convicted and pleaded with the jury to spare his life.

Three members of Mr. Banks's immediate family, his mother, an older sister, and his oldest brother, also testified during the sentencing phase of the trial. They described Mr. Banks's home life when he was growing up, including the challenges of being one of ten children of a mother who was in and out of prison because of various forgery convictions and whose fathers were generally absent. They also portrayed Mr. Banks as a gentle child who enjoyed cooking, playing with cars, writing poetry, and drawing pictures. In addition, they described the difficulties that Mr. Banks experienced when, at the age of sixteen, he learned that he was HIV- positive. These family members testified that they loved and missed Mr. Banks and that they intended to continue to correspond with and visit Mr. Banks while he was incarcerated.

Through cross-examination of Mr. Banks's witnesses, the State established that Mr. Banks had been assigned to a prison unit where the prisoners were afforded special privileges and that, while Mr. Banks's disciplinary history compared favorably to the general inmate population, the number of his disciplinary offenses was high when compared with the offenses of other prisoners on the unit. The State also established that Mr. Banks had been supported during his youth by a loving grandmother, older siblings, and members of his church and that his older siblings did not mistreat him.

The State presented to the jury that Mr. Banks's criminal record included assault, battery, and domestic violence. In addition, the State called Ms. Thompson, Mr. Banks's former girlfriend, as a rebuttal witness. Ms. Thompson painted a starkly different picture from the one painted by his family and church friends. She testified that Mr. Banks never told her that he was HIV-positive and that she learned about his medical condition from another one of his former girlfriends. She also testified that Mr. Banks regularly abused her physically and verbally, and she described an incident when Mr. Banks pointed a gun to her stomach when she was eight months pregnant.

The jury returned its verdict on Monday, April 11, 2005. It concluded that the State had proved the existence of both aggravating circumstances beyond a reasonable doubt.[11] The jury also found unanimously and beyond reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the jury unanimously sentenced Mr. Banks to death.

At a later sentencing hearing, the trial court merged the first two counts of the indictment – the two capital convictions – and sentenced Mr. Banks to death. It imposed a twenty-five year sentence for the attempt to commit first degree murder conviction and a twenty-five year sentence for the especially aggravated robbery conviction and determined that Mr. Banks should serve these sentences consecutively to each other and to the merged capital conviction.

---

[11]Specifically, the jury determined that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another" and that "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any robbery."

Mr. Banks appealed to the Court of Criminal Appeals, raising numerous challenges to his convictions and sentences. On July 6, 2007, the Court of Criminal Appeals affirmed Mr. Banks's convictions for first degree murder and the resulting sentence of death. *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *59 (Tenn. Ct. App. July 6, 2007). The court also affirmed Mr. Banks's convictions for especially aggravated robbery and criminal attempt to commit premeditated murder, as well as their resulting sentences. *State v. Banks*, 2007 WL 1966039, at *59. The affirmance of Mr. Banks's capital convictions and death sentence triggered an automatic review by this Court in accordance with Tenn. Code Ann. § 39-13-206(a)(1) (2006). Mr. Banks raises numerous arguments related to his convictions and sentences which we will address in turn.

## III.
### THE FAILURE TO INCLUDE AGGRAVATING CIRCUMSTANCES IN THE INDICTMENT

After careful study of the parties' briefs with regard to the issue of the failure to include the aggravating circumstances in the indictment, we are persuaded that the decision of the Court of Criminal Appeals on this issue should be affirmed. Moreover, because we find that the opinion of the Court of Criminal Appeals, *State v. Banks*, 2007 WL 1966039, at *38 adequately states the facts and the law on this issue, we adopt this portion of the opinion as the opinion of this Court and include it as an appendix to this opinion.

## IV.
### THE ADMISSION OF THE PHOTOGRAPH OF MR. ATILEBAWI

After careful study of the parties' briefs with regard to the issue of the admission of the photograph of Mr. Atilebawi, we are persuaded that the decision of the Court of Criminal Appeals on this issue should be affirmed. Moreover, because we find that the opinion of the Court of Criminal Appeals, *State v. Banks*, 2007 WL 1966039, at *14-16 adequately states the facts and the law on this issue, we adopt this portion of the opinion as the opinion of this Court and include it as an appendix to this opinion.

## V.
### THE ADMISSION OF MR. BANKS'S STATEMENTS TO THE POLICE BEFORE RULING ON HIS MOTION TO SUPPRESS

After careful study of the parties' briefs with regard to the issue of Mr. Banks's suppression motion, we are persuaded that the decision of the Court of Criminal Appeals on this issue should be affirmed. Moreover, because we find that the opinion of the Court of Criminal Appeals, *State v. Banks*, 2007 WL 1966039, at *16-19, adequately states the facts and the law on this issue, we adopt this portion of the opinion as the opinion of this Court and include it as an appendix to this opinion.

## VI.
### THE ADMISSION OF MR. ATILEBAWI'S STATEMENT TO OFFICER JONES AS AN EXCITED UTTERANCE

Mr. Banks asserts that the trial court erred by admitting into evidence statements made by Mr. Atilebawi to Officer Jones. Mr. Banks specifically takes issue with the following testimony:

> PROSECUTOR: Officer Jones, when you asked Mr. Atilebawi what happened, what did he tell you?
>
> OFFICER JONES: He told me that a person that he knew as Boo asked to use his phone. As he was talking on the phone he was acting very suspicious. And at that time he walked out. He felt a very sharp pain to his head and to his shoulder and heard a couple pops and he ran back inside the house.
>
> PROSECUTOR: . . . Who ran back inside the house?
>
> OFFICER JONES: The . . . suspect did. . . . They were outside talking because he walked back outside with the phone. And as they ran back inside the house, he felt another – he heard another pop and he felt a sharp pain to his shoulder.

Mr. Banks objected at trial that this testimony constituted inadmissible hearsay. The trial court, however, concluded that the testimony was admissible as an excited utterance and also stated it could possibly be admitted as a dying declaration.[12] The Court of Criminal Appeals concluded that the trial court did not err by admitting the statement as an excited utterance. Mr. Banks appeals from the Court of Criminal Appeals's conclusion. He contends that the statement does not fall within the excited utterance exception because (1) the statement was made in response to a question, (2) the statement was given several hours after Mr. Atilebawi was shot, and (3) Mr. Atilebawi was not still under the stress of a startling event. We affirm the Court of Criminal Appeals's determination that the trial court did not err in admitting the statement as an excited utterance.

Decisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion. Thus, reviewing courts will not disturb these decisions on appeal unless the trial court has abused its discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004); *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002). Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008).

---

[12]Mr. Banks is correct that the statement does not qualify for the dying declaration exception to the hearsay rule. Mr. Atilebawi's statement cannot qualify as a dying declaration because he survived the attack. *State v. Lewis*, 235 S.W.3d 136, 149 (Tenn. 2007) (noting that one element of the dying declaration exception is that the declarant is "dead at the time of the trial"). Tennessee evidence law provides that the exception for statements made "under belief of impending death" only applies where the declarant is unavailable because he or she has died. Tenn. R. Evid. 804(b)(2); Tenn. R. Evid. 804(b)(2) advisory comm'n cmt.; *see also* Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.35[2][b], at 8-156 (5th ed. 2005) ("*Tennessee Law of Evidence*").

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay evidence is inadmissible unless permitted by the rules of evidence or otherwise by law. Tenn. R. Evid. 802. Tennessee law recognizes numerous exceptions to the bar on the admission of hearsay evidence. *See generally* Tenn. R. Evid. 803; Tenn. R. Evid. 804. Despite the significant number of exceptions, "it would be a mistake to underestimate the force of the basic rule, which especially but by no means only in criminal trials, plainly excludes a substantial amount of otherwise relevant evidence."[13]

Well-rooted among the myriad of exceptions to the general rule barring hearsay evidence are excited utterances. Excited utterances are statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). To qualify as an excited utterance, three criteria must be met: (1) there must be a startling event or condition that causes the stress or excitement; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant was under the stress or excitement caused by the startling event or condition. *State v. Gordon*, 952 S.W.2d 817, 820 (Tenn. 1997); *State v. Samuel*, 243 S.W.3d 592, 600 (Tenn. Crim. App. 2007); *see also Tennessee Law of Evidence* §8.07[3][b] to [3][d], at 8-75 to 8-78.

Mr. Banks contends that Mr. Atilebawi's statements to Officer Jones cannot qualify as excited utterances because they were made in response to Officer Jones inquiring into what had happened. We find little merit in this argument because "statements made in response to questions may still be admissible if the declarant is under the excitement or stress of the event." *State v. Gordon*, 952 S.W.2d at 820-21; *see also State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993). Simply stated, "[t]he fact that a question prompted the excited answer is a circumstance relevant to stress, but it does not automatically bar the statement's admission" as an excited utterance. *Tennessee Law of Evidence* §8.07[3][d], at 8-78.

Mr. Banks also argues that the statements cannot qualify as excited utterances because they were made by Mr. Atilebawi to Officer Jones approximately four to six hours after the startling event.[14] We find little merit in this argument because the "length of time between a startling event and the statement does not automatically preclude the statement's being admissible as an excited utterance." *Williams v. State*, No. W2006-00605-CCA-R3-PC, 2007 WL 2120174, at *7 (Tenn. Crim. App. July 24, 2007). In fact, "[t]he time interval is material only as a circumstance bearing on the issue of continuing stress." *Tennessee Law of Evidence* §8.07[3][d], at 8-77.

Finally, Mr. Banks argues that Mr. Atilebawi did not make his statement to Officer Jones while still under the stress of a startling event. As previously noted, if a statement is not made while the declarant is under the stress of a startling event, then it cannot qualify as an excited utterance.

---

[13] Frederick Schauer, *On the Supposed Jury-Dependence of Evidence Law*, 155 U. Pa. L. Rev. 165, 176-77 (2006).

[14] The evidence does not permit an exact determination of the length of the interval between Mr. Atilebawi being shot and Officer Jones arriving on the scene. For the purpose of this opinion, we accept Mr. Banks's suggested time frame that approximately six hours passed between Mr. Atilebawi being shot and his response to Officer Jones's inquiry.

*State v. Gordon*, 952 S.W.2d at 820; *State v. Samuel*, 243 S.W.3d at 600; *see also Tennessee Law of Evidence* §8.07[3][d], at 8-77 to 8-78.  While the statements are not per se inadmissible because they were made several hours after the startling event in response to Officer Jones's questions, the facts that they were responses to questions and that they were made several hours after the shooting are relevant matters for the trial court to consider in assessing whether Mr. Atilebawi remained under the stress or excitement caused by his being shot four times by Mr. Banks.  While not an exclusive list, other relevant factors "include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself." *State v. Gordon*, 952 S.W.2d at 820; *State v. Smith*, 870 S.W.2d 561, 574 (Tenn. 1993); *Tennessee Law of Evidence* §8.07[3][d], at 8-77.

The trial court offered a detailed and persuasive analysis for its admission of Mr. Atilebawi's statements to Officer Jones as an excited utterance:

> I don't know how much more of a situation you could describe than to have been shot four or five times and have your Uncle in the other room shot, blood pouring out of your head and being asked who did this.
>
> I think it's still in the purview of all of the events that were transpiring, the spontaneity of it may certainly still be there.  This is the first officer on the scene.  He's going up to the guy saying what happened, who did this.  This certainly [is an] excited utterance . . . . [I]f a person in good health has had 30 minutes to sit and ponder it, it may not be an excited utterance.  But if an individual who has undergone this sort of traumatic event is asked by the first officer on the scene what happened, I think that the spontaneity and trustworthiness and reliability [are] there . . . .

Although we conclude that the dying declaration exception to the hearsay rule is not applicable, the trial court's analysis of the applicability of that exception bolsters its finding that this statement constituted an excited utterance.  The trial court stated the following:

> [T]his guy had just been shot three times in the head.  His Uncle had been shot execution style in the other room and he had blood gushing out of his head and he was undergoing all of this. . . .  I think the injuries were so severe . . . to the brain, to the head, . . . and to the skull that it's entirely plausible . . . that this person was giving this information to a law enforcement officer, contemplating [the] likelihood that he may not pull through.

Officer Jones also offered the following testimony regarding Mr. Atilebawi's condition:

> When we actually got there, he was still on the couch and kind of in a dazed, confused state. And we saw all the blood and immediately we went ahead and started the paramedics to get over to treat him. . . . He was just in shock and . . . just very, very disoriented and trying to tell us that his Uncle was still in the other room . . . .

The determination of whether to admit the statements made by Mr. Atilebawi to Officer Jones is a discretionary one. Our review is limited to determining whether the trial court abused its discretion regarding that particular inquiry. The nature of the event (being shot and left for dead while having a close associate shot and killed in one's home), the condition of the Mr. Atilebawi (in shock and requiring urgent medical attention), and the nature of the statement (answering an officer's inquiry about what had happened) all strongly support the conclusion that Mr. Atilebawi was still under the stress caused by the startling event. Under the facts and circumstances of this case, we cannot conclude that the trial court abused its discretion in admitting Mr. Atilebawi's statements to Officer Jones under the excited utterance exception to the hearsay rule.

## VII.
### THE CONFRONTATION CLAUSE AND THE ADMISSION OF MR. ATILEBAWI'S STATEMENTS TO OFFICER JONES

Mr. Banks insists that the trial court violated his constitutional rights under the Confrontation Clauses of the state and federal constitutions[15] by admitting into evidence Mr. Atilebawi's statements to Officer Jones. Mr. Banks argues that the statements were testimonial and that Mr. Atilebawi was available to testify, thus the admission thereof violated his constitutional right of confrontation as construed in *Crawford v. Washington*, 541 U.S. 36 (2004). The State responds that Mr. Banks's rights to confrontation were not violated because the statements were non-testimonial and because Mr. Atilebawi, the declarant, testified at trial. The Court of Criminal Appeals found that there was no violation of Mr. Banks's right to confront the witnesses against him. We affirm the determination of the Court of Criminal Appeals.

The United States Supreme Court, interpreting the Sixth Amendment in *Crawford v. Washington*, noted that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford v. Washington*, 541 U.S. at 59 n. 9. The Court added that the Confrontation Clause "does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford v. Washington*, 541 U.S. at 59 n. 9. Article I, section 9 of the Tennessee Constitution does not require a different conclusion. Mr. Atilebawi was available and in fact was cross-examined by Mr. Banks "face to face." Mr. Banks was not deprived of his right to confront Mr. Atilebawi, and his contention otherwise is wholly without merit.

---

[15]Tenn. Const. art. I, § 9 ("[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face"); U.S. Const. amend VI (that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him").

Mr. Banks insists that the trial court's use of a non-credentialed Arabic language interpreter violated his federal and state due process rights and his right to confront the witnesses against him.[16] Specifically, he asserts that the trial court erred by failing to follow the procedures for the use of non-credentialed interpreters required by Tenn. Sup. Ct. R. 42, § 3(e) and (f). Even though Mr. Banks did not object to the interpreter's qualifications at trial and failed to include this issue in his motion for new trial, the Court of Criminal Appeals determined that the trial court did not commit plain error with regard to the use of the Arabic language interpreter. We agree.

**A.**

The guilt phase of the trial began on April 6, 2005, with Mr. Atilebawi as the State's first witness. Before Mr. Atilebawi began to testify, the following colloquy occurred between the trial court and Alladin Ghanem, the Arabic language interpreter:

> THE COURT: And let me ask a couple of questions of you for the record. Your name is Mr. Ghanem; correct?
>
> THE INTERPRETER: Yes.
>
> THE COURT: You are certified by the State of Tennessee as a translator/interpreter for court proceedings; is that correct?
>
> THE INTERPRETER: Yes. Yes, Your Honor.
>
> THE COURT: And specifically in Arabic language?
>
> THE INTERPRETER: Yes.
>
> THE COURT: And in a variety of dialects of the Arabic language; correct?
>
> THE INTERPRETER: Yes, sir.
>
> THE COURT: Including the Iraqi language and dialect and idioms and related matters?
>
> THE INTERPRETER: I have record here also in the state of Shelby County of doing this for over 15 years.

---

[16]Mr. Banks specifically questions the portion of the translation of Mr. Atilebawi's testimony regarding Mr. Atilebawi's personal use of marijuana. He insists that he had no way to challenge the impartiality of the interpreter or the accuracy of the translation because an Arabic language interpreter had not been assigned specifically to the defense.

Mr. Banks did not request further voir dire regarding Mr. Ghanem's qualifications, and he did not object to the use of Mr. Ghanem as the interpreter during the trial. In addition, Mr. Banks did not take issue with the qualifications or use of Mr. Ghanem in his motion for new trial.

**B.**

When a defendant raises an issue for the first time on appeal, the issue will generally be deemed waived and will be considered only within the limited parameters of an appellate court's discretionary plain error review. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005); *State v. Maddin*, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005); *see also* Tenn. R. App. P. 3 (e); Tenn. R. App. P. 36(a); Tenn. R. Crim. App. 52(b). The defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial. *State v. Bledsoe*, 226 S.W.3d 349, 354-55 (Tenn. 2007). Under plain error review, relief will only be granted when five prerequisites are met: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007).

**C.**

Notwithstanding Mr. Ghanem's statement that he was a certified Arabic language interpreter, Mr. Banks asserts on appeal that Mr. Ghanem is not a certified or registered Arabic language interpreter and asks the appellate court to take judicial notice of this fact. The Court of Criminal Appeals did not address this argument directly. Instead, the court accredited Mr. Ghanem's uncontradicted statement that he was a certified Arabic language interpreter and, therefore, held that the trial court was not required to comply with the requirements of Tenn. Sup. Ct. R. 42, § 3(e) and (f).

The Administrative Office of the Courts issues photographic identification cards to interpreters who are either certified or registered in accordance Tenn. Sup. Ct. R. 42 and also maintains a current listing of all certified and registered interpreters on its website.[17] Accordingly, in cases requiring an interpreter, it is advisable for the courts and the litigants to verify the interpreter's status by requesting him or her to produce the identification card or by consulting the Administrative Office of the Courts's website. In circumstances where an interpreter is either non-credentialed or is unable to demonstrate that he or she is credentialed, the court should then follow the procedures mandated by Tenn. Sup. Ct. R. 42, § 3(e) and (f).

Based on the record in this case, we cannot find that the trial court erred, much less committed plain error, by failing to follow the procedures set forth in Tenn. Sup. Ct. R. 42 § 3(e) and (f). Mr. Ghanem stated that he was certified by the State of Tennessee. Mr. Banks did not challenge this assertion or request further voir dire of Mr. Ghanem. The trial court believed that Mr. Ghanem was a certified interpreter. Accordingly, based on the information available at the time, Tenn. Sup.

---

[17] *See* http://tscaoc.tsc.state.tn.us/geninfo/Programs/Interpreters/rosterindex.htm.

Ct. R. 42 § 3(e) and (f) were inapplicable. It would be utterly nonsensical to find that a trial court erred by failing to follow the procedures required for utilizing a non-credentialed interpreter when the trial court believed, without any objection from the defendant, that it was utilizing a certified interpreter.[18]

The use an interpreter who is neither certified nor registered is not reversible error in and of itself. It may rise to the level of reversible error only in circumstances where a certified or registered interpreter was readily available and where the use of the non-credentialed interpreter undermined the fairness of the proceeding in some way. This record does not indicate that a certified or registered Arabic language interpreter was readily available or that Mr. Ghanem's translation somehow undermined the fairness of the proceeding.

It is difficult for this Court to discern whether Mr. Banks is also making the separate argument in his appellate brief that the trial court erred by failing to appoint a second interpreter to verify the accuracy of Mr. Ghanem's translation for Mr. Banks and his attorney, neither of whom speak Arabic. Nonetheless, we have considered this argument, and we conclude that the trial court's failure to appoint a second interpreter for this purpose was not error. While Tenn. Sup. Ct. R. 42, § 3(g) permits the use of multiple interpreters, the rule does not explicitly authorize the appointment of a second interpreter for the purpose of assessing the accuracy of the first interpreter.[19] Because Mr. Banks never requested a second interpreter for this purpose or any other purpose, the trial court did not err, much less commit plain error, by failing to appoint a second interpreter to review the translation of the first interpreter.

## IX.
### THE TRIAL COURT'S FAILURE TO INTERVIEW THE JURORS TO ASCERTAIN WHETHER THEY HAD BEEN INFLUENCED BY A FORMER JUROR

Mr. Banks takes issue with the trial court's handling of a juror who was excused before the jury began its deliberations on the penalty phase of the trial. Even though he did not raise this issue in the trial court or the Court of Criminal Appeals, he insists that the trial court committed plain error by not immediately removing the juror and by failing to question the remaining jurors to ascertain whether they had been influenced by the former juror. We have determined that the trial court did not commit plain error by failing to dismiss the juror immediately or by failing to interview the jury on its own motion as to the existence of potential prejudice either after it excused the juror or after the jury returned its verdict.

We reiterate that while the decisions of the Court of Criminal Appeals and the Court of Appeals may require the parties to reframe their issues or to adjust their arguments when they seek

---

[18]While not critical to our evaluation of the arguments presented herein, it is, nevertheless, a matter of at least some relevance to the discussion of Mr. Ghanem as an interpreter that the overwhelming majority of Mr. Atilebawi's examinations, both by the prosecution and by the defense, required no translation. The examinations were conducted in English, including the discussion of the actual offense and identification of Mr. Banks as the perpetrator.

[19]Tenn. Sup. Ct. R. 42 cmt. states that two interpreters may be used in lengthy proceedings to enable the interpreters to take breaks and to facilitate attorney-client communications during a court proceeding.

review by this Court, litigants are not free simply to reserve issues until their case reaches this Court. When a defendant fails to present an issue on appeal to the Court of Criminal Appeals, that issue is not properly before this Court and is, instead, waived. *See State v. Butler*, 108 S.W.3d 845, 854 (Tenn. 2003); *State v. Hall*, 8 S.W.3d 593, 596 n.1 (Tenn. 1999); *State v. Buggs*, 995 S.W.2d 102, 109 (Tenn. 1999). Nonetheless, we have determined that the interests of justice prompt us to address this issue to determine whether the trial court committed plain error by not interviewing the jury.

## A.

During a break in the trial on April 8, 2005, Mr. Banks's trial counsel informed the trial court that Dorothy Rooks, a member of the jury venire for Mr. Banks's trial who had not been seated on the jury, informed one of the defense investigators, a friend of Ms. Rooks, that juror William Stroud had made a disturbing comment to her about the case prior to the trial. According to Mr. Banks's lawyer, Ms. Rooks told the investigator that Mr. Stroud commented that he was "hoping that he would end up on this jury so that he could convince people to find him guilty and we'd be out by the weekend." The trial court expressed concern about the comment and decided to conduct a jury-out hearing to hear directly from Ms. Rooks.

Later that day, after the State rested its case-in-chief, Ms. Rooks appeared in court and, with the jury excused, recounted what she had heard. Ms. Rooks stated that Mr. Stroud expressed disappointment about not having been selected as a juror in a different case in which she and Mr. Stroud had both been members of the jury venire. Specifically, Ms. Rooks recalled that Mr. Stroud stated "I was going to drive that sucker." Ms. Rooks indicated that Mr. Stroud appeared to be adamant, but she was not sure exactly what Mr. Stroud meant. She indicated that the other case was also a first degree murder case but not a capital case. Ms. Rooks stated that she became concerned when she learned that Mr. Stroud had been selected as a juror in Mr. Banks's case. She volunteered that "I just thought that it didn't seem like it was a jury of his peers. I mean, there was only one black lady there."

After commenting on how it had been impressed with Mr. Stroud based upon his answers during voir dire and his attentiveness during the proceedings, the trial court asked the bailiffs whether they had observed anything that suggested that Mr. Stroud was interested in railroading Mr. Banks. After the bailiffs responded in the negative, the trial court informed the attorneys that it would need to consider how to address this matter. The trial court also stated that questioning Mr. Stroud about a "casual statement he made [about another case] on the sidewalk while smoking a cigarette" could be counterproductive.

Later the same day, the court again addressed the matter of Mr. Stroud. The trial court stated:

> I have a little bit of concern, I have to be honest with you, that [Ms. Rooks's] greater concern might be the racial make-up of the jury because she let – she made that statement under oath when she testified today. And I don't know why that statement would be relevant to the issue we were discussing and for which she came down here, unless it was really bubbling right beneath the surface and

it finally came out when she took the stand. And that, perhaps, is the overriding reason[] for her lodging the complaint. I'm concerned about that.

Nevertheless, the trial court decided the more prudent course would be to replace Mr. Stroud with an alternate juror. This took place when the trial court excused the other alternate jurors before the jury deliberations began. Outside the presence of the other jurors, the trial court explained its reasoning directly to Mr. Stroud:

> There was a juror that was on this larger panel . . . [who] overheard a remark that was attributed to you outside this building after the close of court or y'all had been excused [from the jury venire for a different trial]. . . . [T]he question having been raised by this juror concerning that remark and how it may affect your impartiality in this case was such that after agonizing over whether to remove you from the jury or not, I felt that just out of an abundance of caution so that no question could be raised in the event that the jury finds Mr. Banks guilty, that I would insert the alternate and remove you from the jury.

Mr. Stroud was excused prior to and did not participate in the jury deliberations in this case. Essentially, he became the equivalent of an excused alternate juror. Mr. Banks did not request the trial court to interview the jury when it dismissed Mr. Stroud before deliberations started and, likewise, did not request the trial court to interview the jury after it returned a guilty verdict to ascertain whether the verdict had been influenced by Mr. Stroud's presence. Therefore, our review of the process the trial court used to excuse Mr. Stroud is for plain error.

**B.**

Mr. Banks's arguments on this issue provide neither a logically nor a legally supported basis for finding error, much less plain error, in the trial court's failure to immediately excuse Mr. Stroud after hearing Ms. Rooks's testimony regarding his comments in another, unrelated case. As far as this record shows, the trial court had no basis to be concerned about Mr. Stroud's presence on the jury before Mr. Banks's trial counsel expressed concern about statements he had purportedly made to Ms. Rooks.

Because the report of Mr. Stroud's comments was second-hand, the trial court decided to hear directly from Ms. Rooks before deciding whether remedial action was warranted. When the trial court questioned Ms. Rooks, it became apparent that the statements attributed to Mr. Stroud did not involve Mr. Banks's case, as was originally represented, but rather an earlier, unrelated case in another court. Rather than excusing Mr. Stroud immediately, the trial court allowed the lawyers to make their final arguments and then charged the jury before it replaced Mr. Stroud with an alternate juror.

We decline to find plain error with regard to the timing of Mr. Stroud being excused from the jury. The presentation of the evidence was essentially completed when the defense raised a

concern about Mr. Stroud. After the trial court interviewed Ms. Rooks, the jury was alone together for only one additional brief break before the trial court completed its charge to the jury and replaced Mr. Stroud with an alternate juror. Accordingly, we decline to find the trial court committed plain error by waiting to excuse Mr. Stroud until immediately before the jury retired to deliberate.

By the same token, we decline to find that the trial court committed plain error by not interviewing[20] the other jurors, either before they retired or following their verdict to ascertain whether they had been influenced by Mr. Stroud's presence on the jury. Mr. Banks did not request the trial court to interview the jurors following Ms. Rooks's testimony and cites no authority requiring the trial court to do so on its own motion. He has failed to demonstrate that the trial court's failure to interview the jurors prior to deliberations violated a clear and unequivocal rule of law or adversely affected one of his substantial rights. Accordingly, we decline to find that the trial court committed plain error by failing to interview the jurors prior to their deliberations.

In the same vein, we decline to find that the trial court committed plain error by not interviewing the jurors following the verdict to determine whether they had been improperly influenced by Mr. Stroud. Defendants in criminal cases have a statutory right to have the jury polled upon request. Tenn. Code Ann. § 20-9-508 (1994). However, they waive this right if they fail to make a timely request that the jury be polled. *Rice v. State*, 4 Tenn. Crim. App. 600, 605, 475 S.W.2d 178, 180 (1971). Mr. Banks has failed to demonstrate that the trial court's failure to interview the jurors regarding Mr. Stroud after they returned their verdict violated a clear and unequivocal rule of law or adversely affected one of his substantial rights.

## X.
### THE TRIAL COURT'S FAILURE TO CHARGE CERTAIN LESSER-INCLUDED OFFENSES

Mr. Banks argues that the trial court violated his constitutional rights by failing to charge certain lesser-included offenses. Mr. Banks requested some, but not all, of these charges at trial. The State asserts that these arguments have either been waived or are not meritorious. The Court of Criminal Appeals found no reversible error. We affirm that decision.

### A.

Mr. Banks was indicted on four counts. He requested the trial court to charge the jury regarding forty-five lesser-included offenses of these offenses. In addition to charging the jury regarding the four offenses for which Mr. Banks was indicted, the trial court charged the jury with nineteen of the forty-five requested lesser-included offense instructions. The jury convicted Mr. Banks of the greatest charge for each count of the four-count indictment. On appeal, Mr. Banks insists that the trial court committed reversible error by failing to give instructions regarding twenty-

---

[20]Mr. Banks's brief uses the verb "poll" rather than the verb "interview." "Polling" the jury relates to questioning the jury after the verdict as to whether they concur with the verdict. The context of the use of the verb "poll" in Mr. Banks's brief indicates that the term connotes interviewing the jury either before or after the verdict. Accordingly, we have chosen to substitute the verb "interview" for "poll." *Lovell v. McCullough*, 222 Tenn. 567, 575-78, 439 S.W.2d 105, 108-10 (1969); *Dixon Stave & Heading Co. v. Archer*, 40 Tenn. App. 327, 334-40, 291 S.W.2d 603, 607-10 (1956); 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.9(e), at 522-24 (3d ed. 2007).

six lesser-included offenses. Mr. Banks requested ten of these instructions at trial. He no longer takes issue on appeal with the trial court's failure to charge sixteen lesser-included offenses he requested at trial. However, for the first time on appeal, he insists that the trial court should have charged sixteen other lesser-included offenses that he had not requested at trial. Our review of the trial court's failure to charge the latter sixteen instructions is for plain error.

Neither the State nor Mr. Banks have offered detailed legal arguments regarding whether each of the purported lesser-included offenses qualify as lesser-included offenses under the *Burns* test. Thus, we will assume for purposes of this opinion that the offenses enumerated by Mr. Banks meet the requirements to qualify as lesser-included offenses. Nevertheless, we find that the trial court did not commit reversible error by failing to charge the jury regarding the twenty-six lesser-included offenses referenced in Mr. Banks's brief.

## B.

Whether a particular instruction regarding a lesser-included offense should have been given is a mixed question of law and fact. *State v. Hatfield*, 130 S.W.3d 40, 41 (Tenn. 2004). We review mixed questions of law and fact de novo with no presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004). When called upon to address a purported failure to charge lesser-included offenses, the reviewing court considers the following three questions: (1) whether the offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether the failure to give the instruction is harmless error. *State v. Allen*, 69 S.W.3d 181, 187 (Tenn. 2002).

This Court fashioned the test for determining whether an offense is a lesser-included offense in *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999).

An offense is a lesser-included offense if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
>
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>> (1) a different mental state indicating a lesser kind of culpability; and/or
>> (2) a less serious harm or risk of harm to the same person, property or public interest; or
>
> (c) it consists of
>> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

*State v. Burns*, 6 S.W.3d at 466-67. Where "a lesser offense is not included in the offense charged, then an instruction should not be given, regardless of whether evidence supports it." *State v. Burns*, 6 S.W.3d at 467. Thus, if the purported lesser-included offense is not actually a lesser-included offense, then the court's inquiry ends.

If, however, "a lesser offense is included in the charged offense, the question remains whether the evidence justifies a jury instruction on such lesser offense." *State v. Burns*, 6 S.W.3d at 467. As for the standard for assessing whether the evidence is sufficient to require an instruction on a lesser-included offense, Tenn. Code Ann. § 40-18-110(a) (2006) provides that

> the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

As a general matter, evidence that is sufficient "to warrant an instruction on the greater offense also will support an instruction on a lesser offense under Part (a) of the *Burns* test." *State v. Allen*, 69 S.W.3d at 188.

In subsequent decisions, this Court has narrowed the application of Part (c) of the *Burns* test by clarifying that instructions are unnecessary where the evidence clearly establishes completion of the criminal act[21] or simply does not involve proof of solicitation or facilitation. *State v. Wilson*, 211 S.W.3d 714, 721 n.2 (2007); *State v. Robinson*, 146 S.W.3d at 487 n.7; *see also State v. Marcum*, 109 S.W.3d 300, 303-04 (Tenn. 2003); *State v. Ely*, 48 S.W.3d 710, 719 (Tenn. 2001). This result follows because for the "lesser offenses under part (c), proof of the greater offense will not necessarily prove the lesser offense." *State v. Allen*, 69 S.W.3d at 188.

The failure to give an instruction on an offense that is, in fact, a lesser-included offense and is supported by the evidence is a non-structural constitutional error. *State v. Page*, 184 S.W.3d 223, 230 (Tenn. 2006). When such a failure occurs, a new trial must be granted unless the reviewing court determines that error was harmless beyond a reasonable doubt. *State v. Thomas*, 158 S.W.3d

---

[21]As discussed below, this limitation applies to attempt and solicitation.

at 379; *see also State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). When undertaking a harmless error analysis in this context, the reviewing court "should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." *State v. Allen*, 69 S.W.3d at 191.

There are two approaches for demonstrating that a failure to give an instruction on a lesser-included offense is harmless error. *State v. Locke*, 90 S.W.3d 663, 675 (Tenn. 2002). The first approach is implicated where the trial court instructs the jury as to the charged offense as well as other lesser-included offenses thereof but does not instruct the jury regarding all of the lesser-included offenses supported by the evidence. When the jury convicts the defendant of the greater charged offense rather than the lesser-included offense or offenses, the jury necessarily rejects all of the other lesser offenses. *State v. Locke*, 90 S.W.3d at 672; *State v. Allen*, 69 S.W.3d at 191; *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). Where one of the charged but rejected lesser-included offenses is an intermediate or buffer offense standing between the errantly omitted lesser-included offense and the offense for which the defendant was convicted, the charging error is shown to be harmless beyond a reasonable doubt. *State v. Locke*, 90 S.W.3d at 675; *State v. Allen*, 69 S.W.3d at 190.

The second approach requires the reviewing court to consider the evidence and then to decide "whether a reasonable jury *would* have convicted the defendant of the lesser-included offense instead of the charged offense." *State v. Richmond*, 90 S.W.3d 648, 662 (Tenn. 2002) (emphasis in original). If no reasonable jury would have convicted the defendant of the uncharged lesser-included offense rather than the offense for which the defendant was convicted, then the failure to charge is harmless beyond a reasonable doubt. *State v. Locke*, 90 S.W.3d at 675.

For all trials conducted on or after January 1, 2002,[22] the defendant must file a written request for an instruction on a lesser-included offense as a prerequisite to taking issue on appeal with the failure to give an instruction on the offense. Failure to request in writing an instruction on a lesser-included offense results in a waiver of a right to take issue on appeal with the omission of the charge. Tenn. Code Ann. § 40-18-110(c).

However, because defendants have a constitutional right to a correct and complete charge of the law applicable to their case,[23] a reviewing court may review the instructions to determine whether the trial court committed plain error by failing to instruct on a lesser-included offense, even if an instruction on the offense was not requested in writing. *State v. Wilson*, 211 S.W.3d at 720-21; *State v. Page*, 184 S.W.3d at 230-31. Under plain error review, relief will be granted only where five prerequisites are met: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Gomez*, 239 S.W.3d at 737. Furthermore, on a review for plain error, the defendant bears the burden of persuading the appellate court that the error

---

[22]*See* Act of May 24, 2001, ch. 338, 2001 Tenn. Pub. Acts 708, 709.

[23]*State v. Page*, 184 S.W.3d at 229.

was of sufficient magnitude that its commission probably changed the outcome of the trial. *State v. Bledsoe*, 226 S.W.3d at 354-55. To rise to the level of plain error, "[a]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." *State v. Page*, 184 S.W.3d at 231.

## C.
### The Attempt or Solicitation Offenses

Mr. Banks contends that the trial court committed reversible error by failing to charge ten attempt or solicitation offenses as lesser-included offenses of premeditated first degree murder, first degree murder in the perpetration of a robbery, and especially aggravated robbery. With regard to his first degree premeditated murder conviction, Mr. Banks asserts that the jury should have been instructed regarding attempted first degree murder, attempted second degree murder, and attempted voluntary manslaughter. As to his first degree murder in the perpetration of a robbery conviction, Mr. Banks claims error in failing to charge the "requisite attempt offenses." In relation to his especially aggravated robbery conviction, Mr. Banks argues that the trial court should have charged the jury as to solicitation to commit attempted especially aggravated robbery, solicitation to commit attempted aggravated robbery, solicitation to commit attempted robbery, attempted especially aggravated robbery, attempted aggravated robbery, and attempted robbery. He requested instructions for three of these ten offenses: attempted especially aggravated robbery, attempted aggravated robbery, and attempted robbery. Our review of the remaining seven attempt/solicitation charges will be limited to a review for plain error.

In our post-*Burns* decisions, this Court has narrowed the circumstances when it is error to not charge attempt, solicitation, and facilitation offenses which qualify as lesser-included offenses under Part (c) of the *Burns* test. With regard to attempt and solicitation,[24] both of which are inchoate offenses, where the evidence clearly establishes the completion of the crime, it is unnecessary for the trial court to charge the jury as to attempt or solicitation. *State v. Robinson*, 146 S.W.3d at 487 n.7 (noting that "instructions are not required on either solicitation or attempt where the evidence clearly establishes completion of the charged offense"); *see also State v. Wilson*, 211 S.W.3d at 721 n.2; *State v. Marcum*, 109 S.W.3d at 303-04; *State v. Ely*, 48 S.W.3d at 719.

The State presented evidence that clearly established the completion of all four of the charged offenses. Mr. Al-Maily was dead. Mr. Atilebawi sustained serious bodily injuries. Messrs. Al-Maily's and Atilebawi's property was taken. Mr. Banks neither presented evidence nor elicited testimony on cross-examination suggesting the applicability of attempt or solicitation to the premeditated first degree murder, first degree murder in the perpetration of a robbery, or especially aggravated robbery counts. In other words, the evidence did not involve crimes that were attempted or solicited but were not completed. Accordingly, we find no error, much less plain error, in the trial court's failure to give the ten attempt and solicitation charges referenced by Mr. Banks on appeal as

---

[24]"If the offense solicited did occur, . . . the defendant may not be convicted of both the solicitation and the completed offense. The solicitation is merged with the completed offense, and the offender may be guilty of the completed offense under § 39-11-402." Tenn. Code Ann. § 39-12-102 (1997) (Tenn. Sentencing Comm'n cmt.).

lesser-included offenses of premeditated first degree murder, first degree murder in the perpetration of a robbery, and especially aggravated robbery, respectively.

## D.
### The Omission of Lesser-Included Offenses Rendered Harmless by the Conviction of the Greater Offense

Mr. Banks also contends that the trial court committed reversible error by failing to charge the jury regarding (1) criminally negligent homicide and reckless endangerment, (2) facilitation to commit second degree murder, reckless homicide, and criminally negligent homicide as well as reckless endangerment and criminally negligent homicide, (3) aggravated assault, facilitation of aggravated assault, attempted aggravated assault, assault, and reckless endangerment, and (4) theft, as lesser-included offenses of first degree premeditated murder, first degree murder in the perpetration of a robbery, criminal attempt to commit first degree murder, or especially aggravated assault. Mr. Banks requested instructions regarding six of these thirteen offenses. Specifically, he requested the trial court to instruct the jury regarding criminally negligent homicide and reckless endangerment with regard to the first degree premeditated murder count, facilitation to commit second degree murder and criminally negligent homicide in relation to the first degree murder in the perpetration of a robbery count, reckless endangerment with regard to the criminal attempt to commit first degree murder count, and theft as a lesser-included offense of especially aggravated assault. Because Mr. Banks did not request the trial court to charge the other lesser-included offenses, our review regarding these offenses will be for plain error.

For each of the four counts charged in the indictment, the trial court charged the jury with lesser-included offenses including intermediate offenses, buffer offenses standing between the charge Mr. Banks asserts the trial court erred by failing to instruct the jury upon and the charge for which Mr. Banks was convicted.[25] Accordingly, any potential error in failing to charge the eleven above-referenced lesser-included offenses was shown to be harmless error beyond a reasonable doubt through the jury's finding that Mr. Banks was guilty of the greater offense and rejection of the intermediate lesser-included offenses. *State v. Locke*, 90 S.W.3d at 675; *State v. Allen*, 69 S.W.3d at 190; *State v. Williams*, 977 S.W.2d at 106.

## E.
### The Omission of Lesser-Included Offenses For Which No Reasonable Jury Would Have Convicted Mr. Banks

---

[25]In addition to charging the jury as to first degree premeditated murder, the trial court also charged the jury as to facilitation of first degree murder, murder in the second degree, facilitation of second degree murder, voluntary manslaughter, facilitation of voluntary manslaughter, and reckless homicide. With regard to the first degree murder in the perpetration of a robbery count, the trial court also charged the jury as to facilitation of first degree murder, second degree murder, and reckless homicide. As for the charge of criminal attempt to commit first degree murder, the trial court also charged the jury with facilitation to commit attempted first degree murder, attempted second degree murder, facilitation to commit second degree murder, criminal attempt to commit voluntary manslaughter, and facilitation to commit voluntary manslaughter. Finally, in addition to charging the jury as to especially aggravated robbery, the trial court also charged the jury as to especially aggravated robbery, aggravated robbery, facilitation of aggravated robbery, robbery, and facilitation to commit robbery.

Mr. Banks also contends that the trial court erred by failing to charge the jury regarding voluntary manslaughter and facilitation to commit voluntary manslaughter as lesser-included offenses of first degree murder in the perpetration of a robbery. He did not request either instruction. Thus, our review of the failure to charge these offenses is limited to plain error review.

Mr. Banks bears the burden of demonstrating the failure to give the voluntary manslaughter and facilitation to commit voluntary manslaughter charges was an error of sufficient magnitude that it probably changed the outcome of trial. *State v. Bledsoe*, 226 S.W.3d at 354-55. He has not carried this burden, and, in fact, the record demonstrates conclusively that these instructions would have been of no consequence.

The trial court charged the jury regarding the lesser-included offense charges of voluntary manslaughter and facilitation of voluntary manslaughter in connection with the premeditated first degree murder count. The jury rejected these lesser-included offenses in favor of finding Mr. Banks guilty of premeditated first degree murder. Thus, the jury concluded that Mr. Banks was "sufficiently free from excitement and passion as to be capable of premeditation,"[26] when he shot Mr. Al-Maily rather than acting with "adequate provocation sufficient to lead a reasonable person to act in an irrational manner."[27] Accordingly, the trial court did not commit plain error in failing to instruct the jury as to voluntary manslaughter and facilitation to commit voluntary manslaughter as lesser-included offenses of first degree murder in the perpetration of a robbery.

Finally, Mr. Banks argues that the trial court erred by failing to instruct the jury regarding aggravated assault as a lesser-included offense of especially aggravated robbery. He requested this instruction. Therefore, our review assesses whether a reasonable jury would have convicted Mr. Banks of aggravated assault instead of especially aggravated robbery. On this question, the State bears the burden of demonstrating that the error was harmless beyond a reasonable doubt.

The trial court instructed the jury regarding several underlying offenses related to robbery which the jury rejected in favor of the greater charge, especially aggravated robbery. The variation between these lesser-included offenses, the offense for which Mr. Banks was convicted, and the offense to which Mr. Banks assigns error in the trial court's failure to charge the jury is the robbery component. Robbery, under Tennessee law, "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (1997). Based on the overwhelming evidence of Mr. Banks's deprivation of Mr. Atilebawi of his property through violence including Mr. Atilebawi's testimony, both of Mr. Banks's confessions, the police recovering Mr. Atilebawi's property in Mr. Banks's possession, and the absence of countervailing evidence, we conclude that no reasonable jury would have found Mr. Banks guilty of aggravated assault rather than especially aggravated robbery. Accordingly, we conclude that any error in failing to charge this lesser-included offense was harmless beyond a reasonable doubt.

---

[26]Tenn. Code Ann. § 39-13-202(d).

[27]Tenn. Code Ann. § 39-13-211 (1997).

# XI.
## THE JURY INSTRUCTION WITH REGARD TO VICTIM IMPACT EVIDENCE

After careful study of the parties' briefs with regard to the issue of the coercive effect of the instruction regarding the consideration of victim impact evidence, we are persuaded that the decision of the Court of Criminal Appeals on this issue should be affirmed. Moreover, because we find that the opinion of the Court of Criminal Appeals, *State v. Banks*, 2007 WL 1966039, at *38-40 adequately states the facts and the law on this issue, we adopt this portion of the opinion as the opinion of this Court and include it as an appendix to this opinion.

# XII.
## THE PROSECUTORS' CLOSING ARGUMENTS DURING THE GUILT PHASE OF THE TRIAL

Mr. Banks claims that the prosecutors made six statements during their closing arguments that require a reversal of his convictions. The State responds that Mr. Banks did not object to several of these statements during trial and that Mr. Banks did not mention any of these statements in his motion for new trial.[28] The Court of Criminal Appeals reviewed each of these statements and determined either (1) that they were not error, (2) that the trial court gave appropriate curative instructions, or (3) that the instruction was not so prejudicial as to require reversal of the conviction.

## A.

Closing arguments have special importance in the adversarial process. Their purpose is to sharpen and to clarify the issues that must be resolved in a criminal case. *Herring v. New York*, 422 U.S. 853, 862 (1975). They accomplish this purpose by enabling the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury. *Christian v. State*, 555 S.W.2d 863, 866 (Tenn. 1977); 11 David L. Raybin, *Tennessee Practice: Criminal Practice and Procedure* § 29.01, at 72 (1985) ("*Tennessee Criminal Practice and Procedure*"). Thus, both the State and the defendant have an ancient right[29] to make closing arguments. *See* Tenn. R. Crim. P. 29.

The lawyers representing the defendant and the State in a criminal trial are expected to be zealous advocates. *Burlison v. State*, 501 S.W.2d 801, 806 (Tenn. 1973) (noting that "the State is entitled to advocacy, as well as the defendant"). Their closing arguments provide them with an opportunity to persuade the jury, *Tennessee Criminal Practice and Procedure* § 29.2, at 73, and thus they should be given great latitude in both the style and the substance of their arguments. *Post v.*

---

[28]The State is mistaken on this point. In his amended motion for new trial, Mr. Banks asserted that the trial court erred "in not providing a curative instruction during the penalty phase correcting the prosecutor's misstatements regarding mitigating factors during the state's closing argument."

[29]The United States Supreme Court has noted that argument between the defendant and counsel for the Crown was an essential part of English criminal trials. As other procedural protections developed, the importance of argument was neither discarded nor diluted. Rather, the primary function of argument shifted to summation of the evidence at the close of the trial. *Herring v. New York*, 422 U.S. at 860-61.

*State*, 580 S.W.2d 801, 808 (Tenn. Crim. App. 1978); 6 Wayne R. LaFave et al. *Criminal Procedure* § 24.7(b), at 456 (3d ed. 2007) ("*Criminal Procedure*"). Closing arguments in criminal cases have a "rough and tumble quality" about them, *State v. Skakel*, 888 A.2d 985, 1060-61 (Conn. 2006), because they are traditionally the one place in the trial where the lawyers are given the greatest leeway in their manner of expression. *Criminal Procedure* § 24.7(b), at 456-57.

Prosecutors are expected to pursue their cases with thoroughness and vigor within the bounds of the law and professional conduct. *State v. Culbreath*, 30 S.W.3d 309, 314 (Tenn. 2000); *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). While the interests of the State are their paramount concern, their actions must be tempered by their impartial search for justice and their obligation to see to it that the defendant receives a fair trial. *State v. White*, 114 S.W.3d 469, 477 (Tenn. 2003); *Burlison v. State*, 501 S.W.2d at 806; *Watkins v. State*, 140 Tenn. 1, 5, 203 S.W. 344, 345 (1918). In the words of Justice Sutherland, while prosecutors "may strike hard blows, . . . [they are] not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935).

A prosecutor's closing arguments have great weight on jurors. *Knight v. State*, 190 Tenn. 326, 332, 229 S.W.2d 501, 503 (1950); *Turner v. State*, 72 Tenn. 206, 210 (1879). Accordingly, a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case. *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999); *Russell v. State*, 532 S.W.2d 268, 271 (Tenn. 1976). However, even though the scope and tenor of their arguments may be limited, *State v. Thomas*, 158 S.W.3d 361, 413 (Tenn. 2005) (appendix), prosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, *United States v. Mullins*, 446 F.3d 750, 759 (8th Cir. 2006), or make derogatory remarks or appeal to the jurors' prejudices, *State v. Reid*, 164 S.W.3d at 320-21.

A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. *United States v. Young*, 470 U.S. 1, 11-13 (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal). An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that if affected the outcome of the trial to the defendant's prejudice. *State v. Thacker*, 164 S.W.3d 208, 244 (Tenn. 2005) (appendix); *State v. Cribbs*, 967 S.W.2d 773, 786 (Tenn. 1998); *see also State v. Reid*, 164 S.W.3d at 321. When called upon to review the propriety of a prosecutor's closing argument, the court should consider: (1) the conduct at issue in light of the facts and circumstances of the case, (2) the curative measures undertaken by the trial court and the prosecution, (3) the intent of the prosecutor in making the improper argument, (4) the cumulative effect of the improper argument and any other errors in the record, and (5) the relative strengths and weaknesses of the case. *State v. Reid*, 164 S.W.3d at 321; *State v. Middlebrooks*, 995 S.W.2d at 559-60; *see also Tennessee Criminal Practice and Procedure* § 29.61, at 112.

Trial courts have significant discretion to control closing arguments. *State v. Stephenson*, 195 S.W.3d 574, 603 (Tenn. 2006) (appendix); *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Ordinarily, counsel must object contemporaneously to a  perceived improper argument. *State v. Thomas*, 158 S.W.3d at 413 (appendix); *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994). However, when flagrantly improper arguments are made, the trial court, with or without objection,

should step in and take proper curative action. *Watkins v. State*, 140 Tenn. at 9, 203 S.W. at 346 (holding that the trial court should have given a "stern rebuke" "promptly and voluntarily" to a prosecutor who made a grossly improper argument); *Turner v. State*, 72 Tenn. at 210; *Sparks v. State*, 563 S.W.2d 564, 569 (Tenn. Crim. App. 1978). Some arguments may be so exceptionally flagrant that they constitute plain error and provide grounds for reversal even if they were not objected to. *State v. Reid*, 91 S.W.3d at 283-84.[30]

**B.**
**The Prosecutor's Argument Regarding the Jury's Role with Regard to**
**Mitigating Circumstances**

The first statement challenged by Mr. Banks relates to the jury's role with regard to mitigating circumstances. The prosecutor argued the following to the jury:

> [Y]ou're going to get a whole list of 17 or 18 of them [(mitigating circumstances)], a whole slew of them. But the Court is not telling you that any of those are mitigating circumstances. The Court can't do that because that's your job. That's your function. And you get to decide whether any of these 17 or 18 decisions are mitigating circumstances.

Mr. Banks objected to this statement and requested a curative instruction. During a bench conference, the trial court explained that this statement was incorrect and permitted the prosecutor to correct her own error. Following the bench conference, the prosecutor argued to the jury that:

> In a few moments, the Court will present you with a list of things that are labeled 'mitigating circumstances.' And it is up to you to accept or reject which ones apply in this case, if any. And after you determine whether any of these are to be considered, during your determination you also have to assess the weight to give each and every single one of these mitigating circumstances, if any.

Mr. Banks did not object to this description of the jury's role with regard to mitigating circumstances.

Following the closing arguments, the trial court gave the following instruction with regard to assessing mitigating circumstances as part of its general instructions:

> Mitigating circumstances. Tennessee law provides that in arriving at the punishment, the jury shall consider as previously

---

[30]Unobjected to closing arguments warrant reversal only in exceptional circumstances. *United States v. Smith*, 508 F.3d 861, 864 (8th Cir. 2007). Accordingly, like the United States Court of Appeals for the Eighth Circuit, "[w]e bear in mind that fleeting comments that passed without objection during the rough-and-tumble of closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review in the reflective quiet of an appellate judge's chambers." *United States v. Mullins*, 446 F.3d at 758.

indicated any mitigating circumstances raised by the evidence which shall include but are not limited to the following: . . . [O]ne, the defendant has no significant history of prior criminal activity. Convictions for the crimes of aggravated assault, aggravated burglary, domestic violence assault, and attempted aggravated burglary are not aggravating circumstances to be considered in determining the penalty but a conviction of that crime may be considered . . . in determining whether or not the defendant has a significant history of prior criminal activity.

Two, the youth of the defendant at the time of the crime.

Three, the defendant was an accomplice in the murder committed by another person and the defendant's conduct was relatively minor.

Four, the defendant is HIV positive and as a result of his illness, the defendant has attempted to take his own life.

Five, the defendant has held several jobs in spite of his illness.

Six, the defendant transferred from school to school and was unable to maintain friendships established at school and did not complete high school.

Seven, the defendant was one of ten children and he received only limited support from his mother and father.

Eight, the defendant's family moved around from place to place and were never really together. Additionally, some of the children were removed from the home.

Nine, the defendant's two younger sisters were raped.

Ten, the defendant's mother is currently incarcerated and has been incarcerated for the majority of the defendant's life. In addition, the defendant's brother Robert Hill was incarcerated during a majority of the defendant's life.

Eleven, . . . the defendant was the youngest of seven brothers and the brothers beat the defendant and picked on him to the point that others had to intervene.

Twelve, despite lack of family support, the defendant was an active member of Leewood Church and participated in the youth activities.

Thirteen, the defendant cared for his pets, tried to improve his domestic skills by learning to cook and has a talent for drawing.

Fourteen, the defendant has been a good inmate.

Fifteen, while incarcerated the defendant has completed numerous programs aimed at rehabilitation.

Sixteen, the defendant has touched the lives of others in a positive way.

Seventeen, both the defendant's family and friends from church will continue to keep in contact with the defendant and support him while he is incarcerated.

And [eighteen], any other mitigating factor which is raised by the evidence produced either by the prosecution or the defense at either the guilt or the sentencing hearing. That is, you shall consider any aspect of defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

No distinction shall be made between mitigating circumstances listed and those otherwise raised by the evidence. The defendant does not have the burden of proving mitigating circumstances. There is no requirement of jury unanimity as to any particular mitigating circumstance or that you agree on the same mitigating circumstance.

Tennessee law provides that the jury shall consider any mitigating circumstances which may include, but are not limited to, those specified in Tenn. Code Ann. § 39-13-204(j) (2006). While the jury must consider these circumstances, the ultimate determination of whether "mitigating evidence exists and the weight to be given to aggravating and mitigating circumstances are issues for the jury." *State v. Morris*, 24 S.W.3d 788, 799 (Tenn. 2000); *see also*, *e.g.*, *State v. Pike*, 978 S.W.2d 904, 918 (Tenn. 1998); *State v. Mann*, 959 S.W.2d 503, 512 (Tenn. 1997).

In accordance with the catch-all provision in Tenn. Code Ann. § 39-13-204(j)(9), the defendant may identify any other mitigation raised by the evidence as a mitigating circumstance. However, the jury is then free to determine whether the suggested circumstance is applicable to the case and the weight that should be given to that particular circumstance. For example, Mr. Banks asserted that the fact that he can cook should be considered as a mitigating circumstance. Accordingly, the trial court instructed the jury that Mr. Banks offered his ability to cook as a mitigating circumstance and that they were required to consider it. However, the jury remained free to determine whether, in fact, Mr. Banks had learned to cook and, if so, whether being able to cook has any particular mitigation value.

We have found statements similar to the prosecutor's original statement in this case to fall within the realm of permissible forms of argument. *State v. Brimmer*, 876 S.W.2d 75, 85 (Tenn. 1994) (declining to find that arguing that "there were no mitigating statements in the case" was reversible error). In addition, the prosecutor immediately corrected her statement, and the trial court gave the jury a complete and proper instruction regarding its role when considering the mitigating evidence. Juries are presumed to follow the trial court's instructions. *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006); *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001). With the trial court's instructions requiring the jury to consider the mitigating circumstances, there is no basis to conclude that the prosecutor's original statement rises to level of being reversible error.

## C.
### The Prosecutor's Reference to a Prior Conviction for Theft of Property

In her argument challenging Mr. Banks's assertion that he had no significant criminal history, the prosecutor mentioned an incident involving a theft of property that occurred when Mr. Banks was

a juvenile. Mr. Banks objected, and during a bench conference, the trial court instructed the prosecutor to explain to the jury that it could not consider this incident. Following the bench conference, the prosecutor stated to the jury:

> I apologize. I mis[-]spoke. The theft of property that you heard about was one that wasn't sustained or handled non-judicially, which means it did not stay on the defendant's criminal background.

Without further objection by Mr. Banks, the prosecutor detailed other criminal offenses committed by Mr. Banks, including aggravated assault, aggravated burglary, criminal attempt to commit aggravated burglary, and domestic assault.

Mr. Banks insists that the prosecutor's correction of her improper statement regarding the juvenile theft of property offense did not cure the error. We disagree. The trial court did not list the juvenile theft conviction among the offenses that the jury could consider in ascertaining the applicability and weight of the claimed mitigating circumstance that Mr. Banks did not have a significant criminal history. In light of the number of and seriousness of the other offenses that Mr. Banks had committed, as well as the fact that the trial court did not include the juvenile theft offense among those that the jury could consider, we decline to find that the prosecutor's original erroneous statement requires a reversal of Mr. Banks's conviction.

### D.
### The Prosecutor's Reference to Giving Weight to Other
### Mitigating Circumstances

Mr. Banks also argues that the prosecutor committed reversible error when she argued:

> [W]hen you look at those mitigating circumstances and when you think about whether or not to give them any weight, I want you to each ask yourself if I give this one weight, what else do I have to give weight? If I give weight to the fact that he's HIV [positive], what else do I give weight to those that have cancer and other diseases and tumors and high blood pressure? That's what I want you to ask yourself.

Even though he did not object to this argument or include it in his motion for new trial, Mr. Banks now insists that this argument "violated . . . [his] state and federal constitutional rights to due process, to a fair jury trial and protections against cruel and unusual punishment." We will review this issue using the plain error analysis.

The State is permitted to argue that mitigating circumstances[31] are not applicable based upon the evidence or that a circumstance is of little or no weight in terms of actual mitigation value. *See*, *e.g.*, *State v. Hall*, 976 S.W.2d 121, 170 (Tenn. 1998); *State v. Brimmer*, 876 S.W.2d at 85; *State v. Howell*, 868 S.W.2d 238, 258 (Tenn. 1993). The State's argument here is neither inflammatory nor improper, thus we find no error, much less plain error.

### E.
### The Prosecutor's Reference to Mitigating Circumstances
### as Special Treatment

Mr. Banks contends that his constitutional rights were also violated by the prosecutor's argument that application of the mitigating factors would give the defendant special treatment. The prosecutor stated the following:

> It's sad but with your everyday common lifetime experiences, you know that it is common for some kids to pick on others, especially in sibling situations. Does it set him apart from any other defendant who commits murder? Does it make him special? Does it make him different? Because a mitigating circumstance, ladies and gentlemen, is one that sets it apart, something that makes this offense something that deserves this defendant - - this defendant deserved to be treated differently than everybody else, special consideration.

Mr. Banks objected to this statement on the ground that the prosecutor was suggesting that consideration of mitigating factors constituted special treatment. The trial court responded as follows:

> [I]t's not so much that he's going to be given special treatment. He's going to be treated like anybody else under the law and the jury is entitled to consider these things. I understand your objection. I'll simply state that you should - - since you do have your argument yet to come, that you should respond to it in your argument. That would be a better course.

The prosecutor then continued with her argument by stating:

> So whether you've been bullied or picked on, you didn't hear any proof of torture. You didn't hear any proof that he had to go a hospital. You didn't hear any proof that it was anything outside the norm of anybody else's childhood growing up experiences. So do

---

[31]Mr. Banks's brief states that "[t]he prosecutor improperly implied that the jury should decide whether an *aggravating circumstance* deserves any weight based upon whether the jury would then have to give other aggravating circumstances any weight" (emphasis added). Based on the substance and context of the argument, Mr. Banks was clearly referring to "mitigating circumstances" rather than "aggravating circumstances."

you set that apart? Is that anything different from what anybody else has had to endure? Is it anything different than what any of you have had to endure? Does it justify or excuse or should it be given less culpability for execution because you had that lifetime childhood experience?

The prosecutor's argument was not that consideration of the mitigating circumstances would afford Mr. Banks special treatment. Rather, the prosecutor was describing mitigating circumstances as those that render a particular offender less culpable than the average person. Regardless of how these arguments are characterized, they fall safely within the domain of legitimate argument that the jury should afford little or no weight to a particular mitigating circumstance asserted by Mr. Banks, specifically that Mr. Banks was picked on and beaten by his brothers. *See*, *e.g.*, *State v. Hall*, 976 S.W.2d at 170; *State v. Brimmer*, 876 S.W.2d at 85; *State v. Howell*, 868 S.W.2d at 258.

## F.
### The Prosecutor's Statement that the Wrong Punishment Would Negate a Guilty Verdict

Mr. Banks also takes issue with the prosecutor's argument that the wrong punishment would negate a guilty verdict and insists that the trial court committed reversible error by failing to grant a mistrial. While he concedes that the trial court gave a curative instruction, he insists that the instruction did not remove the taint of the prosecutor's implication that the statutorily authorized punishments were wrong.

During her closing argument, the prosecutor argued:

> Now we're . . . wrapping up what is . . . the penalty phase. And it is considerably shorter than the first phase or the rest of the trial. But make no mistake, it is no less important. And in fact, it's more important because the wrong punishment negates the proper verdict. And the wrong punishment negates a guilty verdict.

Mr. Banks objected to the assertion that the verdict would be negated. The trial court responded to Mr. Banks's objection as follows:

> I agree. . . . Whatever the verdict is, whatever sentence the jury imposes, whichever one of the three options, that will be the proper verdict because the jury's consideration and ultimate decision is the proper decision. . . . It will not negate what they've done thus far. So I do think that went beyond what is appropriate. Would you like me to offer a curative instruction?

The prosecutor then sought clarification of how she had erred. The trial court reiterated its explanation and indicated that it would provide a curative instruction. The trial court then stated to the jury the following:

-34-

> Ladies and gentlemen, let me instruct you that the last comment made by [the prosecutor] is not to be considered, that whatever your decision is ultimately will be the right decision. And it will not in any way negate the verdict you've reached or the decision you've made thus far.

Mr. Banks offered no further objection and did not request a mistrial.

Juries are presumed to follow the trial court's instructions. *State v. Young*, 196 S.W.3d at 111; *State v. Shaw*, 37 S.W.3d at 904. The trial court's curative instruction adequately remedied the potential prejudice caused by the prosecutor's erroneous argument.

Mr. Banks never requested a mistrial following this comment and did not include the trial court's failure to grant a mistrial as one of the grounds of his motion for new trial. Accordingly, he has waived this issue. We will, nevertheless, review this issue using the plain error analysis.

The decision of whether to grant or deny a mistrial rests within the sound discretion of the trial court. *State v. Smith*, 871 S.W.2d 667, 672 (Tenn. 1994). A mistrial should be declared only upon a showing of manifest necessity. *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003). Accordingly, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. *State v. Robinson*, 146 S.W.3d at 494. An appellate court should not reverse a trial court's decision denying a request for a mistrial absent a clear showing that the trial court abused its discretion. *State v. Reid*, 91 S.W.3d at 279. The burden of establishing the necessity of a mistrial lies with the party seeking it. *State v. Reid*, 164 S.W.3d at 342. We find no error, much less plain error in the trial court utilizing a curative instruction instead of declaring a mistrial. The instruction adequately addressed any concerns regarding the impact on the jury of the prosecutor's statement.

## G.
## The Prosecutor's Reference to Facts Not in Evidence

In his final challenge to the prosecutor's closing arguments, Mr. Banks contends that the prosecutor committed reversible error by stating that Mr. Al-Maily had witnessed the robbery and had begged for his life. He did not object to these statements at trial, and he did not cite these statements in his motion for new trial. Accordingly, he has waived this issue. We will, nevertheless, review this issue using the plain error analysis.

There is nothing improper in the prosecution's argument that Mr. Al-Maily witnessed the robbery. The evidence fully supports this contention. However, there is no evidence that Mr. Al-Maily begged for his life. The jury was instructed that the arguments of counsel are not evidence and are to be disregarded if not supported by the evidence. We presume that the jurors follow their instructions. *State v. Young*, 196 S.W.3d at 111; *State v. Shaw*, 37 S.W.3d at 904. Reviewed in its context in the prosecution's closing argument, this comment had no effect on the verdict in this case. We decline to conclude the prosecutor's statement rises to the level of plain error.

-35-

# XIII.
## THE SUFFICIENCY OF THE EVIDENCE

Mr. Banks challenges the sufficiency of the evidence to support his convictions. Tenn. R. App. P. 13(e) provides that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." When assessing whether there is sufficient evidence to support a criminal conviction, a jury's verdict of guilt removes the presumption of innocence replacing it with a presumption of guilt. *State v. Wilson*, 211 S.W.3d at 718; *State v. Scarborough*, 201 S.W.3d 607, 624 (Tenn. 2006). Thus, a defendant bears the burden of demonstrating that the evidence is insufficient to sustain a guilty verdict. *State v. Dotson*, 254 S.W.3d 378, 395 (Tenn. 2008); *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008).

When reviewing the evidence in a criminal case, appellate courts must afford the State the strongest legitimate view of the evidence as well as give the State the benefit of all reasonable inferences that may be drawn therefrom. *State v. McGouey*, 229 S.W.3d 668, 671 (Tenn. 2007); *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The responsibility for determining the weight and credibility to be given witnesses' testimony and the responsibility to reconcile conflicts in the testimony are entrusted to the triers of fact. *State v. Campbell*, 245 S.W.3d at 335; *State v. Langford*, 994 S.W.2d 126, 127 (Tenn. 1999). With this framework firmly in mind, the ultimate question for an appellate court "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also State v. Dotson*, 254 S.W.3d at 395; *State v. Campbell*, 245 S.W.3d at 335; *State v. Berry*, 141 S.W.3d at 564.

## A.
## The Premeditated First Degree Murder Conviction

Mr. Banks argues that the evidence is insufficient to support his conviction for the premeditated first degree murder of Mr. Al-Maily. He argues that the State failed to prove that he acted with premeditation. Instead, Mr. Banks contends that he shot Mr. Al-Maily in "the heat of passion" and that he was not aware prior to arriving at Mr. Atilebawi's residence that Mr. Al-Maily would be there. Mr. Banks also argues that the State failed to present sufficient evidence to prove that he was the shooter. The State insists that the evidence is sufficient to prove that Mr. Banks shot Mr. Al-Maily and that he acted with premeditation. The Court of Criminal Appeals concluded that the evidence was sufficient to support Mr. Banks conviction for first degree premeditated murder. We concur with the determination of the Court of Criminal Appeals.

Mr. Banks was convicted on the first count of the indictment, a charge of first degree murder for the premeditated killing of Mr. Al-Maily. Pursuant to Tenn. Code Ann. § 39-13-202(a)(1), first degree murder includes the "premeditated and intentional killing of another." The Tennessee General Assembly has defined premeditation for purposes of first degree murder as follows:

> "[P]remeditation" is an act done after the exercise of reflection and
> judgment. "Premeditation" means that the intent to kill must have

been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d).

"Premeditation may be inferred from the manner and circumstances of the killing." *Finch v. State*, 226 S.W.3d 307, 318 (Tenn. 2007). Tennessee courts have identified a number of factors that tend to demonstrate a homicide was premeditated. These factors include, but are not limited to, (1) the use of a deadly weapon to kill an unarmed victim, (2) the procurement of weapons used to commit a murder, (3) declarations of intent to kill the victim, (4) preparations for the concealment of a crime, (5) lack of provocation by the victim, (6) failure to provide aid or assistance to the victim, and (7) calmness after the killing. *State v. Brooks* 249 S.W.3d 323, 329 (Tenn. 2008).

Mr. Banks used a deadly weapon, killed an unarmed victim who gave no provocation, provided no aid or assistance to his victim, and was calm afterwards. Furthermore, Mr. Al-Maily had fully cooperated with Mr. Banks during the robbery. Instead of resisting, Mr. Al-Maily handed over three hundred dollars to Mr. Banks. He also remained in the bedroom lying facedown on the floor as ordered while Messrs. Banks and Hilliard stole clothing, audio speakers, and cash from Mr. Atilebawi's home.

Mr. Banks took the time to search the living room and bedroom for items to steal and then to load the Jeep with speakers and clothes. With Mr. Al-Maily lying facedown on the floor, having fully complied with his directions, Mr. Banks could simply have left the premises with his ill-gotten gains. Instead, he returned to the house, walked up to a person whom he considered a friend who was lying on the floor, and shot him in the back of the head from close range. Viewing the facts in a light most favorable to the State, a reasonable jury could have easily have found beyond a reasonable doubt that Mr. Banks acted with premeditation when he shot Mr. Al-Maily.

We now turn to the question of whether the State presented sufficient evidence to demonstrate that Mr. Banks shot Mr. Al-Maily. We conclude that, viewing the facts in the light most favorable to the State, the testimony of Mr. Atilebawi, the physical evidence, the fact that Mr. Banks was found driving the stolen Jeep containing the property stolen from Mr. Atilebawi, and Mr. Banks's confession that he shot Mr. Al-Maily provide sufficient evidence to permit a reasonable jury to find beyond a reasonable doubt that Mr. Banks shot Mr. Al-Maily.

**B.**
**The Murder in the Perpetration of a Robbery Conviction**

Mr. Banks also contends that the evidence is insufficient to support his conviction for murder in the perpetration of a robbery. He argues that any robbery that occurred was a separate and distinct event from the shooting of Mr. Al-Maily. Additionally, Mr. Banks argues there was no evidence that

he intended to rob Mr. Al-Maily and that ownership of the money and the red Jeep that were found in his possession was not conclusively established. Citing *State v. Smith*, 24 S.W.3d 274 (Tenn. 2000), Mr. Banks also points out that a conviction cannot be founded solely on a defendant's confession. The State contends that it presented sufficient evidence to support the conviction. The Court of Criminal Appeals concluded that the evidence was sufficient to support a conviction for murder in the perpetration of a robbery. We agree.

Under Tennessee law, first degree murder includes "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). Robbery, under Tennessee law, "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). The Tennessee General Assembly has expressly provided that "[n]o culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts" in that subdivision. Tenn. Code Ann. § 39-13-202(b).

It is a long-standing rule of Tennessee law that to fall within the definition of felony murder, a killing must have been "done in pursuance of the unlawful act, and not collateral to it . . . . [In other words,] [t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it." *State v. Rice*, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting *Farmer v. State*, 201 Tenn. 107, 115-16, 296 S.W.2d 879, 883 (1956)). In applying this requirement, this Court has concluded that "[t]he killing 'may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action.'" *State v. Thacker,* 164 S.W.3d at 223 (quoting *State v. Buggs*, 995 S.W.2d at 106). The defendant must have the intent to commit the underlying felony either prior to or concurrent with the act causing the victim's death. *State v. Thacker,* 164 S.W.3d at 223; *State v. Buggs*, 995 S.W.2d at 107. A defendant's actions immediately after the killing can provide a basis from which the jury may reasonably infer that the defendant, either prior to or concurrent with committing the act that caused the victim's death, had an intent to commit the underlying felony. *State v. Thacker,* 164 S.W.3d at 223; *State v. Buggs*, 995 S.W.2d at 108.

We have long recognized that a conviction cannot be based solely on a defendant's confession and, therefore, that the State must present some corroborating evidence to establish the corpus delicti. *State v. Smith*, 24 S.W.3d at 281. The "corpus delicti" refers to the "body of the crime – evidence that a crime was committed at the place alleged in the indictment." *Van Zandt v. State,* 218 Tenn. 187, 202, 402 S.W.2d 130, 136 (1966).[32] The threshold for establishing the corpus delicti is "low" and requires only "slight evidence," which can be met through reliance upon circumstantial evidence. *State v. Housler*, 193 S.W.3d 476, 490-91 (Tenn. 2006). Thus, "[a] confession may sustain a conviction where there is other evidence sufficient to show the commission

_____

[32]The term "corpus delicti" is often confused for the "dead body." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 226 (2nd ed. 1995) (*"A Dictionary of Modern Legal Usage"*). However, it refers to "[t]he fact of a trangression" and will generally be established in a criminal homicide case through the evidence of the death of the victim joined with some evidence that the death resulted not from an accident but a criminal act. Black's Law Dictionary 346 (7th ed. 1999); *A Dictionary of Modern Legal Usage* 226.

of the crime by someone." *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999) (quoting *Taylor v. State*, 479 S.W.3d 659, 661-62 (Tenn. Crim. App. 1972)).

After shooting Mr. Atilebawi, Mr. Banks entered Mr. Atilebawi's house and, along with Mr. Hilliard, searched through Mr. Atilebawi's living room and bedroom looking for items to steal. Having just shot Mr. Atilebawi and with the gun still in his possession, Mr. Banks took three hundred dollars in cash from Mr. Al-Maily. Messrs. Banks and Hilliard gathered packaged clothing, audio speakers, and cash and loaded them into the red Jeep. Mr. Banks then shot Mr. Al-Maily before leaving. Mr. Banks used violence and fear to rob Messrs. Atilebawi and Al-Maily. Viewing the facts in the light most favorable to the State, there is sufficient evidence from which a reasonable jury could have found beyond a reasonable doubt that there was a connection in time, place, and continuity of action between the shooting of Mr. Al-Maily and the robbery.

As for ownership of the property, Mr. Atilebawi testified that Mr. Banks stole his cash, silver key rings, and his red Jeep. Mr. Banks confessed that he stole the cash from Messrs. Atilebawi and Al-Maily as well as audio speakers, clothing, and a red Jeep. He was found in possession of all of the above when arrested by the police. Viewing the facts in the light most favorable to the State, this evidence provides a sufficient basis from which a reasonable juror could conclude beyond a reasonable doubt that the property was owned by Messrs. Atilebawi and Al-Maily.

As for Mr. Banks's argument that a confession alone is insufficient evidence upon which to convict a defendant, he is correct insofar as there must be some slight evidence in addition to a confession in order to establish the corpus delicti. In this case, the discovery of Mr. Al-Maily's dead body with a gunshot wound in the back of his head and no firearm next to him would adequately meet this standard by providing evidence that a homicide occurred in a manner other than by accident. The evidence bolstering Mr. Banks's confession, however, extends significantly beyond the discovery of the body with a gunshot wound – as does the evidence of his guilt in general. By way of illustration, Mr. Banks was arrested after the shootings in a vehicle stolen from Mr. Atilebawi with Mr. Atilebawi's property inside.

## C.
### The Criminal Attempt to Commit First Degree Murder Conviction

Mr. Banks asserts that the State presented insufficient evidence to support his conviction for criminal attempt to commit first degree murder. He argues that the shooting occurred following provocation during an argument regarding Mr. Banks having been cheated out of a large sum of money and the alleged sexual assault on his former girlfriend. He asserts that the evidence supports only an intent to cause bodily injury because he left the scene without "finish[ing] the victim off." The State argues that the evidence presented was sufficient. The Court of Criminal Appeals concluded that a reasonable jury could have found that Mr. Banks acted with premeditation and intended to kill Mr. Atilebawi. We agree.

The Tennessee General Assembly has defined criminal attempt as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

(c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

Tenn. Code Ann. § 39-12-101. As noted above, first degree murder includes the "premeditated and intentional killing of another," Tenn. Code Ann. § 39-13-202(a)(1), and premeditation for purposes of first degree murder has been defined as follows:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d).

The evidence establishes that several days before the murder Mr. Banks began quite deliberately plotting his revenge upon Mr. Atilebawi. Because the firearm that he kept in his Ford Explorer was not working, Mr. Banks obtained another firearm from Mr. Hilliard. Messrs. Hilliard and Banks discussed disposing of Mr. Atilebawi's dead body in the Wolf River. Mr. Banks shot Mr. Atilebawi four times, including twice in the head. He tried to conceal the body, but Mr. Atilebawi was too heavy to move.

Mr. Banks offers no legal support for his argument that his decision to leave Mr. Atilebawi on the driveway, covered in blood and still bleeding from four different gunshot wounds, including two shots to his head, negates his intent to kill Mr. Atilebawi. Viewing the facts in a light most favorable to the State, there is sufficient evidence from which a reasonable jury could find beyond a reasonable doubt that Mr. Banks acted with premeditation in shooting Mr. Atilebawi.

## D.
## The Especially Aggravated Robbery Conviction

Finally, Mr. Banks contends that the State presented insufficient evidence to prove that he committed an especially aggravated robbery. Specifically, he takes issue with the sufficiency of the evidence that the Jeep was stolen or that the shooting of Mr. Atilebawi was related to robbery. Mr. Banks asserts that the robbery and the shooting were not connected. The State responds that the record contains ample evidence to support Mr. Banks's conviction for the especially aggravated robbery of Mr. Atilebawi. The Court of Criminal Appeals concluded that the evidence presented was sufficient for a reasonable jury to conclude that the elements of especially aggravated robbery had been proven beyond a reasonable doubt. We agree.

Robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Especially aggravated robbery is a robbery that is "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a).

With regard to evidence of the Jeep belonging to Mr. Atilebawi, Mr. Atilebawi testified that Mr. Banks stole his Jeep. Mr. Banks admitted in both of his confessions to stealing Mr. Atilebawi's Jeep, and a neighbor of Mr. Banks testified that she had never seen him in a red Jeep until the morning after the shootings.

Mr. Banks came to Mr. Atilebawi's house with a loaded semi-automatic pistol. He shot Mr. Atilebawi with that pistol four times. As a result, part of Mr. Atilebawi's brain had to be removed, and he spent a month in the hospital. Mr. Atilebawi suffered permanent cognitive impairments. This shooting of Mr. Atilebawi was closely connected in time, place, and continuity of action with the robbery. Viewing the facts in the light most favorable to the State, a reasonable jury could find beyond a reasonable doubt that Mr. Banks committed especially aggravated robbery.

## XIV.
### THE TRIAL COURT'S REFUSAL TO PERMIT MR. BANKS TO CALL OFFICER MIKE BARTLETT AS A WITNESS DURING THE PENALTY PHASE

Mr. Banks takes issue with the trial court's refusal to allow him to call one of its own court officers to testify during the penalty phase of the trial regarding his good conduct as a prisoner. Even though he concedes that he did not include this perceived error in his motion for new trial or raise it before the Court of Criminal Appeals, Mr. Banks asserts that the denial of his request to call the court officer constituted plain error because it infringed on his right to call witnesses under the Sixth Amendment to the United States Constitution and violated his constitutional due process of law

protections. We have determined that the trial court did not commit plain error by denying Mr. Banks's request to call one of its court officers to testify about Mr. Banks's good conduct.

Before the presentation of evidence in the penalty phase of the trial began, the trial court announced that Officer Mike Bartlett, one of the four deputies assigned to safeguard and attend the jury while it was sequestered, had reported to him that the defense had asked him to testify as a mitigation witness. The trial court stated on the record that

> Absent extraordinary circumstances, I'm not going to allow that to happen. I don't think it's appropriate.
>
> I think for bailiffs who have been sworn and charged with the responsibility of guarding the jurors and establishing a rapport with them all week long, to then be called to testify for either side is inappropriate. I think there are many other jailers and law enforcement personnel that have had contact with this defendant over the past two and a half years and over the past week that could testify to the same thing that Officer Bartlett would be available to testify on. And it's almost a betrayal of the trust between the deputy and the jurors to then start calling those deputies to the stand to testify.
>
> . . . It's just not appropriate. And so if there were some extraordinary circumstance, if some phenomenal event occurred, then that might be different. But if it's just to generally testify to the good conduct of the defendant as he came and went from the courtroom each day, no, that's not appropriate. And it would be cumulative and for all those reasons.

Mr. Banks's lawyer thanked the court "for putting that on the record" but did not object or take exception to the trial court's decision. During the penalty phase, Mr. Banks called multiple witnesses who addressed his conduct while in jail pending trial including Officer Michael Conner, Officer Charlene Compton, Officer Wayman Thomas, Officer Latosha Nadia, and Commander Roy L. Rogers. Because Mr. Banks did not make an offer of proof regarding what Officer Bartlett's testimony would have been, the record contains no indication that Officer Bartlett had any additional testimony that would be anything more than cumulative to that of the other witnesses.

The trial court's decision not to allow the bailiff charged with safeguarding the jury to testify during the sentencing phase of the trial was entirely correct. In parallel circumstances this Court has previously disapproved of the practice of an officer who has testified in a criminal case having charge of the jury. *Ellis v. State*, 218 Tenn. 297, 306, 403 S.W.2d 293, 297 (1966). We find no error, plain or otherwise, in the trial court's decision to exclude Officer Bartlett as a penalty phase witness.

# XV.
## THE SENTENCES FOR ATTEMPTED FIRST DEGREE MURDER AND ESPECIALLY AGGRAVATED ROBBERY

Mr. Banks challenges his consecutive twenty-five year sentences for attempted first degree murder and especially aggravated robbery on three grounds. First, he asserts that these sentences violate *Blakely v. Washington*, 542 U.S. 296 (2004) and that he was entitled to a presumptive sentence in the absence of a finding of enhancement factors by the jury. Second, he asserts that each of these sentences was excessive. Third, he asserts that the trial court erred by ordering these sentences to be served consecutively. The Court of Criminal Appeals found each of these claims to be without merit. We agree.

## A.

In *Blakely v. Washington*, the United States Supreme Court held that the Sixth Amendment required sentences in criminal cases to be based on the facts either admitted by the defendant or found by the jury. *Blakely v. Washington*, 542 U.S. at 303-04. Therefore, the Court held that trial courts could not impose a sentence higher than the statutory maximum sentence if their decision was based on facts that were neither admitted by the defendant nor found by the jury. *Blakely v. Washington*, 542 U.S. at 304. However, in the remedial portion of its decision in *United States v. Booker*, 543 U.S. 220, 245-68 (2005), the United States concluded that judicial fact-finding in sentencing was permissible so long as sentencing guidelines were advisory rather than mandatory.[33]

As they existed prior to 2005, Tennessee criminal sentencing statutes established a sentencing range and a "presumptive sentence" for each class of felonies other than capital murder.[34] Under the sentencing procedures required by these statutes, a trial court could not increase a defendant's sentence above the presumptive sentence unless it found that enhancement factors existed. If the trial court determined that enhancement factors existed, it then had the authority to increase a defendant's sentence up to the maximum sentence provided for that range.[35]

The decision in *Blakely v. Washington* placed a constitutional cloud over the power of trial courts in Tennessee to sentence defendants beyond the statutory presumptive sentence based on facts not reflected in the jury's verdict. Accordingly, in 2005,[36] the Tennessee General Assembly amended the sentencing statutes to make the statutory sentencing guidelines advisory and to remove the presumptive sentences for each class of felonies other than capital murder. *See* Tenn. Code Ann. § 40-35-210(c) (2006); *State v. Carter*, 254 S.W.3d at 343. The removal of the presumptive sentences and rendering the guidelines advisory cured the Sixth Amendment defect noted in *Blakely v.*

---

[33] *United States v. High Elk*, 442 F.3d 622, 626 (8th Cir. 2006); Douglas A. Berman & Stephanos Bibas, *Making Sentencing Sensible*, Ohio St. J. Crim. L. 37, 52-54 (2006).

[34] *See State v. Gomez*, 239 S.W.3d at 739.

[35] *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

[36] *See* Act of May 18, 2005, ch. 353, 2005 Tenn. Pub. Acts 788.

*Washington* using the *United States v. Booker* remedy and enabled Tennessee's trial courts to sentence a defendant to any sentence within the applicable range as long as the length of the sentence is "consistent with the purposes and principles of the sentencing statutes." *See* Tenn. Code Ann. § 40-35-210(d).[37]

Mr. Banks knowingly exercised his right to be sentenced under the sentencing laws as amended in 2005.[38] As a result of this decision, he did not have the right to a presumptive sentence.[39] Accordingly, Mr. Banks's objections to his sentences for attempted first degree murder and especially aggravated robbery based on *Blakely v. Washington* and his purported right to be sentenced at the presumptive sentence are without merit.

**B.**

Mr. Banks also takes issue with the length of his sentences for attempted first degree murder and especially aggravated robbery. He asserts (1) that these sentences are excessive, (2) that the trial court relied on enhancement factors that were not supported by the evidence, (3) that the trial court "erred in his treatment of the mitigating factors," and (4) that the trial court violated *Blakely v. Washington* by considering "enhancement factors [that] were not determined by a jury." The Court of Criminal Appeals found that the length of these sentences was not excessive. We agree.

Mr. Banks has a statutory right to take issue on appeal with the length of his sentences on the ground that they are excessive. Tenn. Code Ann. § 40-35-401(b)(2) (2006). When reviewing a sentence, an appellate court must review the record de novo and must presume that the determinations made by the court from which the appeal is taken – in this case the Court of Criminal Appeals – are correct. Tenn. Code Ann. § 40-35-401(d). We have interpreted this statutory standard of review to mean that an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *State v. Carter*, 254 S.W.3d at 346. Mere disagreement with how the trial court weighed enhancing and mitigating factors is not an adequate basis for reversing a sentence. *State v. Carter*, 254 S.W.3d at 345-46.

---

[37] These principles can be found in Tenn. Code Ann. §§ 40-35-102, -103 (2006 & Supp. 2007). The Tennessee General Assembly chose "Bookerization" rather than "Blakelyization" when it replaced the formerly presumptive guideline in favor of advisory guidelines. Stephanie Watson, *Fixing California Sentencing Law*, 39 McGeorge L. Rev. 585, 593 n.89 (2008) (hereinafter "Watson") (quoting Model Penal Code: Sentencing (Prelim. Draft. No. 4 2005)). Tennessee was the first state in which the legislature converted a former presumptive guidelines system into an advisory system. Model Penal Code: Sentencing, Reporter's Introductory Memorandum xxxvii & n.19 (Tent. Draft No. 1 2007); Watson at 593. In 2007, the California State Legislature also opted for "Bookerization" rather than "Blakelyization." Watson at 591-97.

[38] Mr. Banks's lawyer questioned her client when the sentencing hearing began. After discussing the "old sentencing law" and the "new sentencing law," she asked Mr. Banks "which law do you wish to go under?" He responded, "[t]he new one."

[39] Mr. Banks acknowledged his understanding that he was not entitled to a presumptive sentence when he agreed that his lawyer had "explained to . . .[him] that under the new sentencing law that the court is required to start at the . . . minimum time in the range for the particular offense as opposed to where they used to start at the middle of the range."

-44-

The twenty-five year sentences imposed on Mr. Banks by the trial court and affirmed by the Court of Criminal Appeals are the maximum sentences for convictions for attempted first degree murder and especially aggravated robbery. As the Court of Criminal Appeals noted, the trial court's sentencing decision with regard to Mr. Banks's convictions for attempted first degree murder and especially aggravated robbery were based on the following six enhancement factors: (1) Mr. Banks had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range,[40] (2) Mr. Banks was the leader in the commission of the offense,[41] (3) the personal injuries inflicted upon and the amount of damage to property sustained by or taken from Mr. Atilebawi were particularly great,[42] (4) Mr. Banks failed to comply with the conditions of a sentence involving release into the community,[43] (5) the felony was committed while Mr. Banks was released on probation,[44] and (6) Mr. Banks abused a position of private trust.[45] *State v. Banks*, 2007 WL 1966039, at *45-46. The trial court also considered Mr. Banks's apparent lack of remorse and his dangerousness.

Before the Court of Criminal Appeals, Mr. Banks took issue with the trial court's reliance on the three enhancement factors in Tenn. Code Ann. § 40-35-114(2), (6), (14). He also asserted that the trial court had erred by disregarding all his mitigating factors solely because of his lack of remorse. The State conceded that the evidence did not support the trial court's reliance on the enhancement factors in Tenn. Code Ann. § 40-35-114(6), (14)[46] but insisted that the evidence fully supported the trial court's reliance on the enhancement factor in Tenn. Code Ann. § 40-35-114(2) and that the trial court had not improperly disregarded Mr. Banks's mitigating factors.

The trial court focused its analysis on the nature and characteristics of Mr. Banks's criminal conduct in this case, the weight of the evidence supporting the enhancement factors, and the relative lack of weight of Mr. Banks's mitigation evidence. The trial court considered all of the criteria set out in Tenn. Code Ann. § 40-35-210(b) and then imposed a sentence within the applicable range. The trial court explained its reasons for imposing the sentences, and most of the trial court's relevant findings are adequately supported by the record. *See State v. Carter*, 254 S.W.3d at 346.

---

[40] Tenn. Code Ann. § 40-35-114(1) (2006).

[41] Tenn. Code Ann. § 40-35-114(2).

[42] Tenn. Code Ann. § 40-35-114(6).

[43] Tenn. Code Ann. § 40-35-114(8)

[44] Tenn. Code Ann. § 40-35-114(13)(C).

[45] Tenn. Code Ann. § 40-35-114(14).

[46] In the brief filed in this Court, the State seeks to side-step its concession in the Court of Criminal Appeals that the trial court should not have considered the enhancement factors in Tenn. Code Ann. § 40-35-114(6), (14). This the State cannot do because of the doctrine of judicial estoppel. *See Marcus v. Marcus*, 993 S.W.2d 596, 602 (Tenn. 1999) (quoting *Obion County v. McKinnis*, 211 Tenn. 183, 186, 364 S.W.2d 356, 357 (1962)) (holding that "a party will not be permitted to occupy inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him").

The trial court's sentencing discretion was broadened when the Tennessee General Assembly enacted the 2005 amendments to the sentencing statutes. *State v. Carter*, 254 S.W.3d at 345. We have conducted a detailed, de novo review of the record with regard to the twenty-five year sentences Mr. Banks received for attempted first degree murder and especially aggravated robbery, and we have determined that the evidence supports the trial court's finding of the enhancement factors in Tenn. Code Ann. § 40-35-114(1), (2), (8), and (13)(c). Accordingly, despite the trial court's reliance on two inapplicable enhancement factors, we, like the Court of Criminal Appeals, have concluded that the trial court considered and weighed all the matters that Tenn. Code Ann. § 40-35-210 required it to consider and that the four remaining enhancement factors more than adequately support the trial court's discretionary decision to impose twenty-five year sentences for these two crimes.

## C.

In his final challenge to his non-capital sentences, Mr. Banks argues that the trial court erred by ordering these sentences to be served consecutively. Specifically, he insists that his criminal history after he became eighteen years old was not extensive enough to influence whether he should serve his non-capital sentences concurrently or consecutively.

The Tennessee General Assembly has provided the courts with the factors to consider when determining whether sentences should be served concurrently or consecutively. Tenn. Code Ann. § 40-35-115(b) (2006). A trial court may order multiple sentences to be served consecutively upon finding that any one of the seven factors contained in Tenn. Code Ann. § 40-35-115(b) apply. However, if the trial court bases its decision to require sentences to be served consecutively on its finding that the defendant is a dangerous offender, it must make additional findings regarding the severity of the crimes committed and the necessity to protect the public from further criminal acts by the defendant. *State v. Allen*, 259 S.W.3d 671, 689 (Tenn. 2008); *State v. Robinson*, 146 S.W.3d at 524 (appendix); *State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999).

Although it is only necessary for the trial court to find one of the factors in Tenn. Code Ann. § 40-35-115(b) in order to require Mr. Banks to serve his non-capital sentences consecutively, the trial court found that three factors were applicable. In accordance with Tenn. Code Ann. § 40-35-115(b)(2), the trial court found that Mr. Banks's record of criminal activity was extensive, particularly for someone so young. The trial court also found, in accordance with Tenn. Code Ann. § 40-35-115(b)(4), that Mr. Banks was a dangerous offender. Finally, the trial court had already determined that Mr. Banks had committed his crimes while on probation. *See* Tenn. Code Ann. § 40-35-115(b)(6).

Mr. Banks argues that the trial court should not have considered his juvenile record and that he did not have a particularly extensive criminal record after his eighteenth birthday. Neither the law nor the facts support this argument. When determining whether sentences should run consecutively or concurrently, trial courts are not limited to considering the defendant's criminal activity or conduct that occurred after the defendant's eighteenth birthday. *State v. Stockton*, 733 S.W.2d 111, 112 (Tenn. Crim. App. 1986); *see also* Tenn. Code Ann. § 37-1-133(b) (2005) (authorizing the use of juvenile records in the preparation of pre-sentence reports).

Mr. Banks's presentence report and other evidence in this case provides ample evidence of his extensive criminal record and of his dangerousness. He has prior convictions on two counts of assault, one of which involved bodily harm. He has been convicted of aggravated burglary. His criminal conduct in this case demonstrates a lack of regard for human life and a lack of hesitation to resort to violence to commit crimes that create a high risk to human life. Based on our de novo review of the record, we have concluded, like the Court of Criminal Appeals, that the trial court, in accordance with Tenn. Code Ann. § 40-35-115, did not err by ordering Mr. Banks to serve his sentences for attempted first degree murder and especially aggravated robbery consecutively.

## XVI.
### THE SUFFICIENCY OF THE EVIDENCE REGARDING THE STATUTORY AGGRAVATING CIRCUMSTANCES REQUIRED BY TENN. CODE ANN. § 39-13-204(i) (2006)

The death penalty cannot be imposed unless the jury determines unanimously that the State has proved beyond a reasonable doubt one or more of the aggravating circumstances in Tenn. Code Ann. § 39-13-204(i) (2006). In Mr. Banks's case, the jury determined that the State had proved the existence of two aggravating circumstances – Tenn. Code Ann. § 39-13-204(i)(6)[47] and Tenn. Code Ann. § 39-13-204(i)(7).[48]

In the Court of Criminal Appeals, Mr. Banks challenged the adequacy of the evidence with regard to both of these aggravating circumstances. The Court of Criminal Appeals concluded that the evidence supported the jury's finding with regard to the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(7) but not the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(6). However, the Court of Criminal Appeals also determined that the trial court's error in submitting the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(6) to the jury was harmless beyond a reasonable doubt.

In this Court, Mr. Banks asserts that the evidence is insufficient to support the finding of an aggravating circumstance under either Tenn. Code Ann. § 39-13-204(i)(6) or Tenn. Code Ann. § 39-13-204(i)(7) and that the trial court's error with regard to the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(6) was not harmless. The State argues that the evidence supports both aggravating circumstances and, in the alternative, that the error, if any, with regard to the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(6) was harmless. We have determined that the evidence fully supports the jury's finding with regard to both aggravating circumstances. Therefore, we reverse the Court of Criminal Appeals's decision that the evidence does not support the finding of an aggravating circumstance under Tenn. Code Ann. § 39-13-204(i)(6).

### A.

---

[47] The aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(6) arises when "[t]he murder is committed for the purpose of avoiding, interfering with, or preventing the lawful arrest or prosecution of the defendant or another."

[48] The aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(7) arises when "[t]he murder was knowingly committed . . . by the defendant, while the defendant had a substantial role in committing . . . any . . . robbery . . . ."

In addressing whether the evidence is sufficient to support a jury's finding of the existence of an aggravating circumstance, our standard of review is framed by taking the facts in a light most favorable to the State and by considering whether a rational trier of fact could have found the existence of an aggravating circumstance beyond a reasonable doubt. *State v. Reid*, 164 S.W.3d at 314; *Terry v. State*, 46 S.W.3d at 160-61. Even if a defendant has not expressly challenged the sufficiency of an aggravating circumstance found by the jury, it is, nevertheless, the duty of this Court to determine whether "[t]he evidence supports the jury's finding of statutory aggravating circumstance or circumstances." Tenn. Code Ann. § 39-13-206 (c)(1)(B); *see also State v. Reid*, 164 S.W.3d at 314.

## B.
### The Tenn. Code Ann. § 39-13-204 (i)(6) Aggravating Circumstance

The jury found unanimously that the State had proven beyond a reasonable doubt that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(6). This aggravating circumstance arises where one of the defendant's motivations for killing the victim was to avoid arrest or prosecution. *State v. Ivy*, 188 S.W.3d 132, 149 (Tenn. 2006). While this aggravating circumstance is not limited to killing of eyewitnesses or those who could identify the defendant, *State v. Reid*, 164 S.W.3d at 315, the killing of a witness to a crime because that person witnessed a crime may, depending on the circumstances, constitute a killing for purpose of avoiding arrest or prosecution. *State v. Reid*, 213 S.W.3d 792, 818 (Tenn. 2006); *State v. Rollins*, 188 S.W.3d 553, 572 (Tenn. 2006); *State v. Davis*, 141 S.W.3d 600, 618-19 (Tenn. 2004).

The Court of Criminal Appeals concluded that the evidence was insufficient to support the Tenn. Code Ann. § 39-13-204(i)(6) aggravating circumstance. It reasoned as follows:

> The proof establishes that the victim, Kadhem Al-Maily, observed or overheard the shooting and robbery of his friend, Hussain Atilebawi. After review, it is apparent that the proof, relevant to this issue, fails to support application of the (i)(6) factor. We are unable to conclude that the Appellant's course of action, before and after the homicide of the victim, is consistent with or corroborative of the motive that he killed the victim to prevent his arrest. Indeed, as asserted by the Appellant, after the perpetration of the crime, he did not flee the area, but, rather, he remained in the community. Moreover, the Appellant made no effort to move his victims or to conceal evidence of the crimes. The Appellant argues that, to apply the (i)(6) factor in this case, without more proof, would make the factor inherent in any murder involving the perpetration of a robbery. We agree. The only other possible theory supporting the existence of the (i)(6) aggravating circumstance is the argument that, because the Appellant knew the victim, it could be inferred that the victim might recognize him. The evidence, however, does not support this inference beyond a reasonable doubt. Indeed, the evidence shows that

the Appellant left a witness who could identify him, Atilebawi, and that he knew when he left that Atilebawi was alive. Accordingly, we conclude that the jury's finding of the (i)(6) aggravating factor must be vacated.

*State v. Banks*, 2007 WL 1966039, at *53. We respectfully disagree with this finding. Viewing the evidence in the light most favorable to the State, we have concluded that the evidence shows beyond a reasonable doubt that Mr. Banks killed Mr. Al-Maily to eliminate him as a witness to his crimes.

The Court of Criminal Appeals's finding that Mr. Banks "made no effort to move his victims" is not supported by the record. Mr. Banks confessed to attempting to move Mr. Atilebawi's body. He stated in his first confession that he "was scared and didn't want nobody to see [Mr. Atilebawi]." Mr. Banks also told the police that he had tried to conceal Mr. Atilebawi's body but that Mr. Atilebawi was too heavy to move.[49] In addition to his admission that he tried to conceal Mr. Atilebawi's body after shooting him, Mr. Banks also admitted that he and Mr. Hilliard had actually discussed throwing Mr. Atilebawi's body in the Wolf River to conceal their crime. This evidence is more than sufficient to enable a reasonable juror to conclude that Mr. Banks was planning the ways that he would conceal his crimes several days before he committed them and that he was intent on concealing his crimes after he arrived at Mr. Atilebawi's house.

As evidence that he was not attempting to conceal his crimes when he killed Mr. Atilebawi, Mr. Banks points to the fact that Mr. Atilebawi was still alive when he left the scene. However, the facts of this case would also enable a reasonable juror to conclude that Mr. Banks believed that Mr. Atilebawi was either dead or dying when he left the scene. He had shot Mr. Atilebawi four times, twice in the head. Mr. Atilebawi was lying bleeding in his driveway. Mr. Atilebawi was consciously trying to avoid moving or attracting Mr. Banks's attention because he was afraid that Mr. Banks would shoot him again. Mr. Banks offered no aid or assistance to Mr. Atilebawi. On these facts, a reasonable juror could easily conclude that Mr. Banks left Mr. Atilebawi for dead.

Mr. Banks also points to the fact that he stayed in the neighborhood of the crime and did not attempt to flee as further evidence that he was not attempting to conceal what he and Mr. Hilliard had done the night before. If anything, this evidence would prompt a reasonable juror to conclude that Mr. Banks did not attempt to flee because he believed that he had killed the only two eyewitnesses to the crime. This conclusion is buttressed by Mr. Banks's own confession. When asked to explain his early morning spending spree after leaving Mr. Atilebawi's house, Mr. Banks's answers reflected his belief that he was under no danger of being arrested because he assumed that Messrs. Atilebawi and Al-Maily were dead or would die before they had a chance to talk with the police. When asked why he purchased new rims and tires for the stolen red Jeep, Mr. Banks replied that he purchased these items because he planned to keep the Jeep. He also volunteered that he had picked up a job application at Walgreens.

Most importantly, however, the circumstances surrounding Mr. Al-Maily's death provide persuasive evidence regarding Mr. Banks's motivation for shooting him. From Mr. Banks's point

---

[49]Mr. Banks's precise words were "I tried to pull him away but he was too heavy to move."

of view, the only remaining witness who could identify him was his friend, Mr. Al-Maily. Mr. Al-Maily had handed over his money without resistance, had not interfered in any way with Messrs. Banks and Hilliard, and had complied with the order to lie face down on the floor of Mr. Atilebawi's bedroom. After Messrs. Banks and Hilliard loaded the stolen property in the Jeep, they could have simply left the scene. Instead, Mr. Banks walked back into Mr. Atilebawi's house, went into Mr. Atilebawi's bedroom, and calmly and deliberately shot Mr. Al-Maily in the head. Mr. Banks had no personal animus toward Mr. Al-Maily. The manner in which he shot Mr. Al-Maily would prompt any reasonable juror to conclude that Mr. Banks shot his friend not to complete the crimes but to cover them up.

Simply stated, viewing the facts in the light most favorable to the State, a reasonable juror could have found beyond a reasonable doubt that Mr. Banks killed Mr. Al-Maily to eliminate a witness to his crimes. Accordingly, we reverse the Court of Criminal Appeals's conclusion that the Tenn. Code Ann. § 39-13-204(i)(6) aggravating circumstance was not sufficiently supported by the evidence. Furthermore, because the aggravating circumstance was sufficiently supported by the evidence, we pretermit any discussion of whether an error in charging this circumstance would have been harmless.

## C.
### The Tenn. Code Ann. § 39-13-204(i)(7) Aggravating Circumstance

Mr. Banks challenges the finding of the Tenn. Code Ann. § 39-13-204(i)(7) aggravating circumstance on three fronts. First, he argues that the State presented insufficient evidence to support the application of this aggravating circumstance. Second, he claims that it is impossible to determine whether this aggravating circumstance applied to his premeditated murder conviction or his felony murder conviction. Third, he insists that applying the aggravating factor to his felony murder conviction violates *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992) because the factor is already inherent in any conviction for murder in the perpetration of a robbery. The Court of Criminal Appeals found Mr. Banks's challenge to the Tenn. Code Ann. § 39-13-204(i)(7) aggravating factor to be without merit. *State v. Banks*, 2007 WL 1966039, at *55. We agree.

We need not tarry long with Mr. Banks's claim that the record contains insufficient evidence to support the invocation of the Tenn. Code Ann. § 39-13-204(i)(7) aggravating factor. The jury concluded unanimously that the State had proved beyond a reasonable doubt that "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any robbery." For the reasons discussed in affirming Mr. Banks's conviction for first degree murder in the perpetration of a robbery and premeditated murder, we find that this aggravating circumstance is sufficiently supported by the evidence.

Mr. Banks's arguments regarding the ambiguity of the application of the Tenn. Code Ann. § 39-13-204(i)(7) aggravating circumstance and the violation of *State v. Middlebrooks* are likewise without merit. The jurors addressed one murder in this case – the killing of Mr. Al-Maily by Mr. Banks. The jurors were asked to determine whether the State proved its two asserted aggravating circumstances beyond a reasonable doubt. They unanimously found that the State had proved both

the Tenn. Code Ann. § 39-13-204(i)(6) aggravating circumstance and the Tenn. Code Ann. § 39-13-204(i)(7) aggravating circumstance beyond a reasonable doubt. It is neither rational nor conceivable that the jurors concluded that these facts were true as to one of the counts of Mr. Banks murdering Mr. Al-Maily but not the other. Mr. Banks either killed Mr. Al-Maily to avoid arrest or prosecution or he did not. He either knowingly killed Mr. Al-Maily in the perpetration of a robbery or he did not.

In 1992, this Court held that Tennessee's broad definition of felony murder and the duplicative language of the felony murder aggravating circumstance required it to hold that Tennessee's first degree murder statute, as it existed at that time, did not sufficiently narrow the class of persons eligible for the death penalty to comply with the Eighth Amendment to the United States Constitution. *State v. Middlebrooks*, 840 S.W.2d at 346. The Tennessee General Assembly responded to this decision in 1995 by amending the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(7) to require that the murder "was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit" one of the enumerated felonies.[50] This amendment narrowed the class of offenders to whom the death penalty could be applied sufficiently so as to leave no *State v. Middlebrooks* problem even in cases where Tenn. Code Ann. § 39-13-204(i)(7) was the only aggravating circumstance established and the conviction was for felony murder. *State v. Reid*, 91 S.W.3d at 306 n.13 (appendix).[51]

**XVII.**

**THE CONSTITUTIONALITY OF TENNESSEE'S DEATH PENALTY STATUTORY SCHEME**

Mr. Banks also makes nine other general arguments that Tennessee's death penalty statutes violate various provisions of the Constitution of the United States[52] and the Constitution of Tennessee.[53] We will address each of these arguments in turn.

**A.**

**The Vagueness and Overbreadth of the Tenn. Code Ann. § 39-13-204(i)(6) Aggravating Circumstance**

---

[50] *See* Act of May 22, 1995, ch. 377, 1995 Tenn. Pub. Acts 587.

[51] Even prior to this legislative amendment, Mr. Banks's argument would have been unavailing for, as this Court indicated in *State v. Hall*, 958 S.W.2d 679, 692-93 (Tenn. 1997), "application of the felony murder aggravating circumstance is inappropriate only if the defendant is convicted *solely* on the basis of felony murder. Implicit in that statement is the recognition that the circumstance properly may be applied if a defendant is convicted of premeditated first degree murder." *See also Carter v. State*, 958 S.W.2d 620, 624-25 (Tenn. 1997); *State v. Price*, 46 S.W.3d 785, 826-27 (Tenn. Crim. App. 2000).

[52] He asserts that all the challenged provisions "[e]xcept where otherwise noted," violate U.S. Const. amend. V, VI, VII, and XIV.

[53] Likewise, he asserts that the challenged provisions "[e]xcept where otherwise noted," violate Tenn. Const. art. I, §§ 8, 9, 16, 17 and Tenn Const. art. II, § 2.

Mr. Banks insists that the Tenn. Code Ann. § 39-13-204(i)(6) aggravating circumstance is vague or overbroad. This Court has consistently recognized that this aggravating circumstance requires that a motive for the killing must have been avoiding, interfering with, or preventing an arrest or prosecution. *See*, *e.g.*, *State v. Ivy*, 188 S.W.3d at 149. There is nothing vague or overbroad about this aggravating circumstance.

**B.**

**The Duplication Between the Aggravating Circumstances in Tenn. Code Ann.**
**§ 39-13-204(i)(6) and Tenn. Code Ann. § 39-13-204(i)(7)**

Mr. Banks argues that the aggravating circumstances in Tenn. Code Ann. § 39-13-204(i)(6) and Tenn. Code Ann. § 39-13-204(i)(7) are unconstitutional because they duplicate each other. These aggravating circumstances have the potential to overlap, particularly when a defendant kills a person in order to eliminate a witness to one of the enumerated felonies set forth in Tenn. Code Ann. § 39-13-204(i)(7) where there exists connection in time, place, and continuity of action between the felony and the murder.

Notwithstanding the fact that these two aggravating circumstances could conceivably apply to the same event, it does not necessarily follow that they are duplicates. It is not difficult to conceive of numerous factual circumstances in which the defendant could commit a murder that would fall within one aggravating circumstance but not the other. For example, a defendant who murders a witness shortly before trial or murders a witness to a crime not included among those enumerated in Tenn. Code Ann. § 39-13-204(i)(7) would fall under the Tenn. Code Ann. § 39-13-204(i)(6) aggravating circumstance but not the Tenn. Code Ann. § 39-13-204(i)(7) aggravating circumstance. Similarly, a defendant who kills a person whom he or she was robbing either because the victim refused to hand-over cash or because of some personal animus would fall under the Tenn. Code Ann. § 39-13-204(i)(7) aggravating circumstance but not the Tenn. Code Ann. § 39-13-204(i)(6) aggravating circumstance. Even assuming, for the sake of argument, that the aggravating circumstances are duplicative, Mr. Banks has failed to demonstrate or explain why this duplication would undermine their constitutionality.

**C.**
**The Vagueness and Overbreadth of the Tenn. Code Ann. § 39-13-204(i)(5)**
**Aggravating Circumstance**

Mr. Banks also insists that the Tenn. Code Ann. § 39-13-204(i)(5) aggravating circumstance is unconstitutionally vague and overbroad. However, the State never attempted to invoke this aggravating circumstance in this case, and the jury certainly never addressed it. Accordingly, Mr. Banks has not demonstrated that he has standing to challenge this aggravating circumstance.

**D.**
**Tennessee's Aggravating Circumstances' Compliance with the**
**Narrowing Requirements of the Eighth Amendment**

In addition to the death penalty not being applicable to any crime that does not result in death, Tennessee narrowly circumscribes the homicide offenses to which the death penalty is applicable. A conviction for vehicular homicide, aggravated vehicular homicide, assisted suicide, reckless homicide, criminally negligent homicide, voluntary manslaughter, or second degree murder does not render a defendant death penalty eligible. Even persons convicted of first degree murder cannot become death penalty eligible until a jury finds unanimously that the State had proved beyond a reasonable doubt the existence of one of the fifteen aggravating circumstances enumerated in Tenn. Code Ann. § 39-13-204(i).

Mr. Banks argues, despite his concession that he has no evidence to support his argument, that most homicides that occur in Tennessee fall within the aggravating circumstances in Tenn. Code Ann. § 39-13-204(i)(5), (6), & (7). He also argues that the concentration of capital cases in three aggravating factors proves that Tennessee's death penalty statutes fail to meaningfully narrow the class of defendants who are death penalty eligible as required by the Eighth Amendment to the United States Constitution.

The United States Supreme Court has held that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). In addition to providing a public declaration of the state's policies regarding the offenses deemed to warrant the use of the death penalty, legislatively created guidelines can also serve to channel the discretion of jurors in determining whether the death penalty is appropriate in a particular case. *Zant v. Stephens*, 462 U.S. at 876-78. Thus, they prevent the wanton and freakish imposition of the death penalty. *Zant v. Stephens*, 462 U.S. at 876.

Through its statutory definition of first degree murder and its statutory enumeration of aggravating circumstances, the Tennessee General Assembly has narrowed the class of defendants to whom the death penalty may be applied. We have repeatedly found that these aggravating circumstances meet the constitutional requirements of narrowing the class of death penalty eligible persons and channeling juror discretion. *See*, *e.g.*, *State v. Bane*, 57 S.W.3d at 426-27; *Terry v. State*, 46 S.W.3d at 161-62; *State v. Keen*, 926 S.W.2d at 742. Mr. Banks's argument has not persuaded us that this determination is in error.

### E.
### Prosecutorial Discretion to Seek the Death Penalty

Mr. Banks asserts that Tennessee's death penalty statutes are unconstitutional because they confer unlimited discretion upon Tennessee's district attorneys general to decide whether to seek the death penalty. He argues that the different values, motivations, and influences of these prosecutors, as well as an absence of clear guidelines to direct their decision-making process, renders Tennessee's death penalty statutes unconstitutionally arbitrary and capricious.

While Tennessee's district attorneys general have been entrusted with broad discretion in making charging decisions, it would be inaccurate to characterize their discretion as entirely unfettered. The Tennessee General Assembly has defined the elements of the offense of first degree

murder and has provided that it is the only offense for which the death penalty may be sought. In addition, the General Assembly has prescribed fifteen aggravating circumstances – at least one of which must be established beyond a reasonable doubt – before the death penalty can be considered. When deciding whether to pursue the death penalty, a district attorney general must take these statutory requirements into account. In addition to these statutory requirements, a district attorney general may not pursue the death penalty without probable cause to believe that the defendant committed the offense. The district attorney general must also make sure that all charging decisions fully comply with the Equal Protection Clause of the Fourteenth Amendment. *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996).

Tennessee's district attorneys general are elected by the voters of their districts. Tenn. Const. art. VI, § 5; Tenn. Code Ann. § 8-7-102 (2002). Local control over prosecutors is a core component of the American criminal justice system because prosecutors reflect the values of their local communities. The fact that they are elected by the voters of their districts assures their accountability.[54] Simply stated, "no one else is in a better position to make charging decisions which reflect community values as accurately and effectively as the prosecutor."[55]

Furthermore, the United States Supreme Court has recognized that prosecutorial discretion provides a vehicle for individualized justice. *McCleskey v. Kemp*, 481 U.S. 279, 311-12 (1987). District attorneys general are officers of the executive branch of government. Accordingly, in the absence of a violation of law, the courts may not interfere with the free exercise of their discretionary authority over the criminal prosecutions in their respective districts. *State v. Gilliam*, 901 S.W.2d 385, 389 (Tenn. Crim. App. 1995).

The constitutionality of Tennessee's death penalty statutes is not undermined because local elected district attorneys general may make discretionary charging decisions with the statutory framework established by the General Assembly. We have repeatedly rejected the argument that such discretion raises a constitutional problem. *State v. Hines*, 919 S.W.2d 573, 582 (Tenn.1995); *State v. Brimmer*, 876 S.W.2d at 86; *State v. Cazes*, 875 S.W.2d 253, 268 (Tenn. 1994); *see also McCleskey v. Kemp*, 481 U.S. at 311-12; *Gregg v. Georgia*, 428 U.S. 153, 199 (1976). Mr. Banks has not provided any argument that persuades us that these decisions are in error.

**F.**
**The Allegedly Discriminatory Imposition of the Death Penalty**

Mr. Banks asserts for the first time on appeal that the death penalty in Tennessee is being imposed in a discriminatory manner based on race, gender, and geography. While the record contains no evidence of discrimination specific to his own case, Mr. Banks relies on various

---

[54]*See generally* Joan E. Jacoby, *The American Prosecutor: A Search for Identity* 47 (1980); William T. Pizzi, *Understanding Prosecutorial Discretion in the United States: The Limits of Comparative Criminal Procedure as an Instrument of Reform*, 54 Ohio St. L.J. 1325, 1337-40 (1993); Kevin K. Washburn, *American Indians, Crime, and the Law*, 104 Mich. L. Rev. 709, 725-29 (2006).

[55]Frank W. Miller, *Prosecution: The Decision to Charge a Suspect With a Crime* 294-95 (1969).

statistical studies to support his belated discrimination claims.  We find that these claims came too late and that Mr. Banks's evidence proves too little.

A defendant in a criminal proceeding who asserts an equal protection violation must prove (1) the existence of purposeful discrimination and (2) that this purposeful discrimination had a discriminatory effect on him or her.  *McCleskey v. Kemp*, 481 U.S. at 292; *see also State v. Irick*, 762 S.W.2d 121, 129 (Tenn. 1988).  A discriminatory purpose "implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *McCleskey v. Kemp*, 481 U.S. at 298 (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).  Thus, the defendant must prove that a discriminatory purpose was one of the factors that motivated the decision-maker.  *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

Statistical proof may be used to prove the existence of a discriminatory purpose in limited circumstances.  In rare cases, it can provide the sole evidence of discriminatory purpose, but to do so, it must depict a stark pattern of discrimination that is unexplainable on other grounds.  *McCleskey v. Kemp*, 481 U.S. at 293-94; *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. at 266.  The United States Supreme Court has also permitted the use of statistical evidence to prove discriminatory intent in jury selection[56] and in Title VII cases.[57]

However, in *McCleskey v. Kemp*, the United States Supreme Court determined that two particular statistical studies[58] of murder cases in Georgia were insufficient to prove discriminatory intent in the context of decisions relating to the imposition of the death penalty in Georgia.   The Court gave four reasons for its conclusion.  First, the Court determined that inferences drawn from general statistics are not applicable to unique juries whose decisions rest on a consideration of innumerable factors that vary according to the characteristics of the defendant and the facts of the particular offense.  *McCleskey v. Kemp*, 481 U.S. at 294.  Second, the Court pointed out that the State had no practical opportunity to explain any of the statistical disparities suggested by the studies.  *McCleskey v. Kemp*, 481 U.S. at 296.  Third, emphasizing the essential role that discretion plays in the criminal justice process, the Court determined that "exceptionally clear proof" of discriminatory purpose is required before the courts will infer that this discretion has been abused.  *McCleskey v. Kemp*, 481 U.S. at 297.  Fourth, a state legislature, exercising its broad discretion with regard to criminal penalties, has legitimate reasons to maintain capital punishment, and there was no showing

---

[56]*See, e.g., Castaneda v. Partida*, 430 U.S. 482, 495-96 (1977); *Turner v. Fouche*, 396 U.S. 346, 358-59 (1970).

[57]*See*, *e.g.*, *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988); *Basemore v. Friday*, 478 U.S. 385, 400-01 (1986) (Brennan, J., concurring in part); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 337-42 (1977).

[58]The "Baldus studies" at issue in *McCleskey v. Kemp* consisted of two statistical studies examining over 2,000 murder cases that occurred in Georgia during the 1970s.  These studies suggested that black defendants who kill white victims had the greatest likelihood of receiving the death penalty.  *McCleskey v. Kemp*, 481 U.S. at 286-87.  The United States District Court found the studies' methodology flawed and declined to consider them.  The United States Court of Appeals assumed that the Baldus studies showed racial disparities in the imposition of the death penalty in Georgia.  The United States Supreme Court did not address the studies' methodology.

that the legislature maintained capital punishment because of a racially disproportionate impact. *McCleskey v. Kemp*, 481 U.S. at 298-99.

## 1.
## Discrimination Based on Race

Mr. Banks argues that the very same statistical study discredited in *McCleskey v. Kemp* and several other general studies[59] "demonstrate the existence of racial discrimination in the imposition of the sentence of death" and that "Tennessee lacks any means of ensuring that discrimination does not infest the death sentencing process." However, he presents no evidence of improper discriminatory purpose with regard to his prosecution on the part of the District Attorney General, the trial court, or the jury that convicted him, and he provides no statistical information specifically regarding racial discrimination in connection with the imposition of the death penalty in Tennessee.

In the absence of other, more direct evidence of a racially discriminatory intent, the evidence offered by Mr. Banks falls far short of the sort of exceptionally clear proof that would enable the courts to conclude that the actions of the decision-makers in his case were motivated by an improper discriminatory purpose based on Mr. Banks's race or the race of Mr. Banks's victim. Accordingly, we concur with the conclusion of the Court of Criminal Appeals that Mr. Banks failed to prove that the imposition of the death penalty in his case was the result of a racially discriminatory purpose.

## 2.
## Discrimination Based on Gender

Mr. Banks's argument regarding discrimination based on gender consists of three sentences and includes no citations to authority. He asserts that Tennessee must discriminate against men in the imposition of the death penalty because "[t]here are 92 men on death row [in Tennessee], but there are only two women." This evidence, by itself, does not provide the sort of exceptionally clear proof upon which to conclude that the decision-makers in Mr. Banks's case were motivated by an improper desire to discriminate against Mr. Banks because he is a male. The difference between the number of men and the number of women on death row can readily be attributed to the fact that fewer women commit crimes that are death penalty eligible.[60]

---

[59]Mr. Banks makes specific reference to a "nationwide study published in the Dallas Times Herald, June 17, 1985," information compiled by the NAACP and found on the Death Penalty Information Center's website, and a 1990 Report of the General Accounting Office to the House and Senate Judiciary Committees.

[60]Scholarly analysis of crime and conviction data indicates that the difference between the number of men and women sentenced to death can be attributed to non-discriminatory factors. There is, for example, a significant variance between the number of murders committed by men and the number of murders committed by women. Lawrence M. Friedman, *Dead Hands: Past and Present in Criminal Justice Policy*, 27 Cumb. L. Rev. 903, 911 (1996-1997); David McCord, *Imagining a Retributivist Alternative to Capital Punishment*, 50 Fla. L. Rev. 1, 123 n.459 (1998). Similarly, there is a well-documented variance between the types of murders generally committed by men and those generally committed by women. Elizabeth Rapaport, *Equality of the Damned: The Execution of Women on the Cusp of the 21st Century*, 26 Ohio N.U. L. Rev. 581, 582-83 (2000); Elizabeth Rapaport, *The Death Penalty and Gender Discrimination*, 25 Law & Soc'y Rev. 367, 369-74 (1991); Victor L. Streib, *Gendering the Death Penalty: Countering Sex Bias in a*

(continued...)

**3.**
**Discrimination Based on Location of the Offense**

Mr. Banks also insists that Tennessee's death penalty is unconstitutional because of the variance in its application among different counties in the State of Tennessee. He specifically notes that although only 15% of the State's population resides in Shelby County, 40% of the population on death row results from Shelby County prosecutions. Additionally, Mr. Banks asserts that Shelby, Davidson, Knox, Madison, Hamilton, and Sullivan Counties, though representing only 42% of the State's population, are responsible for approximately 69% of the death sentences.

Mr. Banks's argument on this point erroneously assumes that variance from a random demographic result is necessarily arbitrary. However, a clearer inspection of the geographic variance in the application of the death penalty in Tennessee suggests that Mr. Banks's statistical argument is misleading. While approximately 16% of the State's population resides in Shelby County,[61] consistently more than 30% of all the murders reported in Tennessee between 2001 and 2007 are committed in Shelby County.[62] In fact, the number of murders reported in Shelby County each year averaged over 35% of the murders reported in the entire State during that period. Thus, the actual number of murders reported in Shelby County corresponds with the 39% of death row inmates from Shelby County.

Similarly, while only approximately 42% of the State's population resides in Davidson, Hamilton, Knox, Madison, Shelby, and Sullivan Counties, these counties consistently account for more than 60% of the murders reported in the State of Tennessee between 2001 and 2007.[63] They have occasionally accounted for more than 70% of the murders reported in Tennessee.[64] Mr. Banks estimates the number of death row inmates from these counties as 69%. If that is the case, the

---

[60](...continued)

*Masculine Sanctuary*, 63 Ohio St. L. J. 433, 459 (2002); *see also* Lawrence A. Greenfeld & Tracy L. Snell, Bureau of Justice Statistics Special Report *Women Offenders* 4 (Revised 2000), *available at* http://www.ojp.usdoj.gov/bjs/pub/pdf/wo.pdf (last visited Oct. 15, 2008).

[61] Riley C. Darnell, *Tennessee Blue Book 2007-2008* 641 (2008) (reporting data collected by the United State Census Bureau's 2000 census).

[62] This information is available through a review of the annual *Crime in Tennessee* reports available from the Tennessee Bureau of Investigation Statistical Analysis Center, *available at* http://www.tbi.state.tn.us/divisions/isd_csu_sac.htm (last visited Oct. 17, 2008). The date for the period from 2001 through 2007 shows that 39.2% of the murders reported in Tennessee in 2001 occurred in Shelby County; 38.5% in 2002; 34.3% in 2003; 30.9% in 2004; 33.7% in 2005; 36.7% in 2006; and 34.9% in 2007.

[63] The data for the period from 2001 through 2007 shows that 71.1% of the murders reported in Tennessee in 2001 occurred in Davidson, Hamilton, Knox, Madison, Shelby, and Sullivan Counties; 69.8% in 2002; 67.0% in 2003; 62.6% in 2004; 72.6% in 2005; 71.9% in 2006; and 68.9% in 2007.

[64] The homicides reported in these six counties exceeded 70% of the total number of homicides reported statewide in 2001, 2005, and 2006.

percentage of murders reported in these counties closely approximates the percentage of defendants on death row from these counties.[65]

Mr. Banks's arguments based on the location of the offense fail to factor in the influence of prosecutorial discretion. As can be seen, they also suffer from a lack of factual support. Accordingly, Mr. Banks has failed to present sufficient evidence to demonstrate that he received the death penalty because he was from Shelby County. To the contrary, the jury sentenced Mr. Banks to death because he murdered Mr. Al-Maily in the perpetration of a robbery and for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution.

## G.
### The Requirement that the Jury Agree Unanimously to a Life Verdict

Mr. Banks argues that requiring the jury to agree unanimously upon a life verdict violates the United States Supreme Court's rulings in *McKoy v. North Carolina*, 494 U.S. 433 (1990) and *Mills v. Maryland*, 486 U.S. 367 (1988). This Court fully addressed and rejected this argument in *State v. Brimmer*, 876 S.W.2d at 87. Mr. Banks has not offered a persuasive argument showing that this decision was in error.

## H.
### The Pattern Jury Instruction Regarding the Jury's Determination of the Existence of a Mitigating Circumstance

Mr. Banks asserts that the Tennessee Pattern Jury Instructions are inconsistent with the United States Supreme Court's ruling in *McKoy v. North Carolina*, 494 U.S. 433 (1990) and *Mills v. Maryland*, 486 U.S. 367 (1988). He argues that these instructions lead jurors to believe erroneously that they must unanimously agree on any mitigating circumstance. While conceding that this argument was rejected generally in *State v. Thompson*, 768 S.W.2d 239, 251-52 (Tenn. 1989), he insists that this case differs from *State v. Thompson* because the trial court did not give the special additional instruction that "[b]ecause different people may have different views about what tends to ameliorate or mitigate . . . you may weigh and consider any and all circumstances which you feel tend to mitigate the offense or defendant in question." *See State v. Thompson*, 768 S.W.2d at 251.

In this case, the trial court instructed the jurors that "[t]he defendant does not have the burden of proving mitigating circumstances. There is no requirement of jury unanimity as to any particular mitigating circumstance or that you agree on the same mitigating circumstance." We find that this instruction does not lead jurors to believe that they must unanimously agree on the existence of a mitigating circumstance. *See, e.g., State v. Hall*, 958 S.W.2d at 718 (appendix).

## I.
### The Process for Ensuring Proportionality

---

[65]Between 2001 and 2007, the average percentage of the reported homicides in these six counties was 69.1% of the statewide total.

Mr. Banks correctly asserts that states should provide meaningful appellate proportionality review of death sentences to ensure that the death penalty is not being arbitrarily and capriciously imposed. He argues that the review process currently being used by Tennessee's appellate courts is inadequate because (1) the jury is not required to make written findings concerning mitigating circumstances, (2) the informational base for comparative review of first degree murder convictions is inadequate and incomplete, (3) the courts' methodology for conducting comparative review is flawed, and (4) the courts allow defendants to waive presentation of mitigating evidence without requiring an offer of proof as to what mitigation is available. He also insists that the process fails to meet the standards required for due process.

While comparative proportionality review provides an important safeguard against arbitrary and capricious sentencing, it is not constitutionally required. *State v. Bland*, 958 S.W.2d 651, 663 (Tenn. 1997). The Tennessee General Assembly has directed the appellate courts to determine whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Tenn. Code Ann. § 39-13-206(c)(1)(D). We have noted that the automatic review by this Court of every death sentence is an integral part of Tennessee's death penalty process. *State v. Pritchett*, 621 S.W.2d 127, 140 (Tenn. 1981).

There are no more serious cases that arrive at this Court's doorstep than death penalty cases. They involve crimes of the most serious impact, and they involve a penalty that is the most severe that can be imposed. Reviewing any death penalty appeal is given the utmost attention and highest priority by each of the members of this Court. Mr. Banks's challenges to this Court's means and methods of reviewing the proportionality of a death sentence have been repeatedly rejected. *See*, *e.g.*, *State v. Reid,* 91 S.W.3d at 286 n.9; *State v. Rimmer*, 250 S.W.3d 12, 43 (Tenn. 2008) (appendix); *State v. Vann*, 976 S.W.2d 93, 118-19 (Tenn. 1998) (appendix); *State v. Keen*, 926 S.W.2d at 743-44; *State v. Barber*, 753 S.W.2d 659, 663-668 (Tenn. 1988).

The Tennessee General Assembly has provided that "[t]he Tennessee Supreme Court may promulgate rules as it deems appropriate to establish such procedures as are necessary to enable the reviewing courts to properly review the death sentence." Tenn. Code Ann. § 39-13-206(c)(2). We continue to find the review process to be a significant contributor to safeguarding against the arbitrary and capricious application of the death penalty. We also continue to find the existing procedures to be adequate to enable this Court to properly carry out its review in death penalty cases.

## XVIII.
### THE CONSTITUTIONALITY OF TENNESSEE'S LETHAL INJECTION PROTOCOL

Mr. Banks contends that the State's lethal injection protocol violates his constitutional rights against the infliction of cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Specifically, Mr. Banks asserts that his federal and state constitutional rights would be violated through the use of Tennessee's execution method because the injections are not prepared, administered or monitored by medical professionals and because of the use of certain drugs in Tennessee's current execution protocol. This Court recently upheld Tennessee's lethal injection

protocol in *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292 (Tenn. 2005).[66] Both of these features of the drug protocol – the use of the three drug protocol and the absence of medical professionals – were present in 2005 and remained when the protocol was further refined in 2007.[67] Mr. Banks has failed to persuade this Court that we should reconsider our earlier decision in *Abdur'Rahman v. Bredesen*.

## XIX.
### THE PENOLOGICAL OBJECTIVE OF THE DEATH PENALTY

Mr. Banks contends that the death penalty is unconstitutional because it fails to serve any legitimate penological objective. The death penalty serves the valid and legitimate penological objectives of deterrence and retribution. *Roper v. Simmons*, 543 U.S. 551, 571 (2005); *Atkins v. Virginia*, 536 U.S. 304, 319 (2002). Thus, we reject Mr. Banks's argument that the death penalty is unconstitutional because it fails to serve any legitimate penological objective.

## XX.
### CONSIDERATION OF THE MANDATORY REVIEW FACTORS IN TENN. CODE ANN. § 39-13-206 WITH REGARD TO MR. BANKS'S SENTENCE

When reviewing a conviction for first degree murder and an accompanying sentence of death, Tenn. Code Ann. § 39-13-206(c)(1) requires the courts to review the record to determine whether

> (A) The sentence of death was imposed in any arbitrary fashion;
>
> (B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
>
> (C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
>
> (D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

---

[66]We also note that the United States Supreme Court has declined to invalidate a substantially similar execution protocol that was challenged on essentially the same grounds. *Baze v. Rees*, ___ U.S. ___, ___, 128 S. Ct. 1520, 1528 (2008).

[67]Tenn. Dep't of Corr., Report on Administration of Death Sentence in Tennessee (Apr. 30, 2007), *available at Workman v. Bredesen*, 486 F.3d 896, 913-921 (6th Cir. 2007) (Appendix A); *see also State v. Payne*, No. M1988-00096-SC-DPE-DD, (Tenn. Oct. 22, 2007) (order), *available at* http://www.tsc.state.tn.us/OPINIONS/TSC/Cap Cases/Payne/20071022/Payne%20Pervis%20Order%2010-22-07.pdf.

We have carefully reviewed the record in this case, and, as we will discuss more fully, we have determined that Mr. Banks's sentence was not imposed in any arbitrary fashion. We have also determined that the evidence supports the jury's findings that the State proved the aggravating circumstances in Tenn. Code Ann. § 39-13-204(i)(6) and Tenn. Code Ann. § 39-13-204(i)(7) beyond a reasonable doubt and that these aggravating circumstances outweigh the mitigating circumstances offered by Mr. Banks. Finally, we have considered the nature of Mr. Banks's crime and all the evidence in the record concerning Mr. Banks as a person, and we have concluded that the sentence of death imposed by the jury in this case is neither excessive nor disproportionate to the penalties imposed for similar offenses.

## A.
## The Manner in which Mr. Banks's Sentence was Imposed

The jury that imposed Mr. Banks's sentence of death unanimously found that the State proved beyond a reasonable doubt that Mr. Banks was guilty of premeditated first degree murder and first degree murder in the perpetration of a robbery. In addition, the jury determined that the State proved beyond a reasonable doubt that the manner in which the murder occurred supported the application of the aggravating circumstances in Tenn. Code Ann. § 39-13-204(i)(6) and Tenn. Code Ann. § 39-13-204(i)(7). Our review of the record satisfies each of us that the trial, and particularly the sentencing hearing, was conducted in a manner consistent with the applicable statutory provisions and the rules of criminal procedure. Accordingly, we conclude that Mr. Banks's sentence of death was not imposed in an arbitrary fashion. *See*, *e.g.*, *State v. Young*, 196 S.W.3d at 115; *State v. Hugueley*, 185 S.W.3d 356, 380 (Tenn. 2006); *State v. Hall*, 958 S.W.2d at 702.

## B.
## The Evidentiary Support for the Aggravating Circumstances

We have already discussed in detail the evidentiary support for the two aggravating circumstances that the jury found to exist in this case. These aggravating circumstances are fully supported by the record.

## C.
## The Relative Weight of the Aggravating and Mitigating Circumstances

In carrying out our obligation under Tenn. Code Ann. § 39-13-206(c)(1)(C), we must determine whether a reasonable juror could find beyond a reasonable doubt that the aggravating circumstances established by the State outweigh the mitigating circumstances presented by the defendant. *State v. Rimmer*, 250 S.W.3d at 34; *State v. Stephenson*, 195 S.W.3d 574, 593-94 (Tenn. 2006). Following a detailed review of this record, we find that a reasonable jury could find, based on the evidence in this case, that the aggravating circumstances outweigh the mitigating circumstances.

Mr. Banks presented and established numerous mitigating circumstances that were intended to present him in a sympathetic light. The eleven witnesses testifying on his behalf pointed out (1) that Mr. Banks was only nineteen years old when he killed Mr. Al-Maily, (2) that Mr. Banks

developed HIV when he was sixteen years old, (3) that Mr. Banks had remained employed, (4) that Mr. Banks frequently transferred from one school to another during his childhood, (5) that Mr. Banks's mother was often absent during his childhood because she was either in prison or in a halfway house, (6) that Mr. Banks's parents did not provide him adequate support, (7) that Mr. Banks had nine siblings and that he was the youngest of seven brothers, (8) that Mr. Banks was picked on by his older siblings when he was a child, (9) that Mr. Banks was an active member of the Leewood Baptist Church, (10) that Mr. Banks's artistic and culinary skills included drawing pictures and cooking, (11) that Mr. Banks had been a model prisoner, (12) that while incarcerated, Mr. Banks had participated in and completed numerous rehabilitation certificate programs, (13) that members of Mr. Banks's church and family wished to remain in contact with him, (14) that two of Mr. Banks's sisters were raped, (15) that Mr. Banks loved animals, particularly dogs, and (16) that Mr. Banks was a positive member of his church and a gentle person.

The State presented evidence that undermined Mr. Banks's mitigation evidence. This evidence showed that, despite the confinement of Mr. Banks's mother, Mr. Banks and his mother had a close relationship. It also showed that Mr. Banks had a loving and supportive relationship with his grandmother before her death and that he was also cared for by his older siblings and members of the Leewood Baptist Church. In other words, Mr. Banks actually had a great deal of support during his childhood from his extended family and his church community.

The mitigation evidence regarding his kind, gentle nature was also undermined by evidence of his criminal history which included assault, battery, and domestic violence. In contrast to the testimony regarding Mr. Banks's gentle nature, his former girlfriend described how Mr. Banks could be extremely cruel and violent. She recounted numerous incidents of domestic violence, including one incident in which Mr. Banks pulled a gun and pointed it at her stomach when she was eight months pregnant.

Based on this evidence, a rational juror could easily have concluded that the aggravating circumstances – killing a witness to avoid arrest and prosecution and killing in the perpetration of a robbery – outweighed the various mitigating circumstances presented by Mr. Banks, particularly his youth, his health, his difficult family circumstances, his active involvement in his church community, and his active involvement in rehabilitation certificate programs in prison.

### D.
### The Proportionality of Mr. Banks's Sentence

When this Court conducts the proportionality review required by Tenn. Code Ann. § 39-13-206(c)(1)(D), we do not function as a "super jury" that simply substitutes our judgment for the sentencing jury. *State v. Godsey*, 60 S.W.3d 759, 782 (Tenn. 2001). Rather, our task is to take a broader perspective than the jurors who sentenced Mr. Banks in order to determine whether his death sentence "is disproportionate to the sentences imposed for similar crimes and similar defendants." *State v. Thacker*, 164 S.W.3d at 232 (quoting *State v. Bland*, 958 S.W.2d at 664). In doing so, the pool of cases upon which we draw in conducting this analysis are "first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined

whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death." *State v. Rice*, 184 S.W.3d at 679.

No two defendants or their crimes are ever identical. Accordingly, the purpose of our review of other capital cases is not to identify cases that correspond precisely with the particulars of the one being analyzed. *State v. Copeland*, 226 S.W.3d 287, 306 (Tenn. 2007); *State v. Thacker*, 164 S.W.3d at 233. Instead, our task is to "identify and invalidate the aberrant death sentence." *State v. Thacker*, 164 S.W.3d at 233 (quoting *State v. Bland*, 958 S.W.2d at 665). A sentence is not disproportionate because other defendants have received a life sentence under similar circumstances. *State v. Carruthers*, 35 S.W.3d 516, 569 (Tenn. 2000). Rather, a death sentence will be excessive or disproportionate where "the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *State v. Thacker*, 164 S.W.3d at 233 (quoting *State v. Bland*, 958 S.W.2d at 668); *State v. Godsey*, 60 S.W.3d at 782.

This Court uses "the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes." *State v. Copeland*, 226 S.W.3d at 305 (quoting *State v. Davis,* 141 S.W.3d at 619 -620). We examine "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved, and we compare this case with other cases in which the defendants were convicted of the same or similar crimes." *State v. Stevens*, 78 S.W.3d at 842. Our approach does not employ a rigid, objective test. Rather, each member of the Court draws upon his or her experience and judgment in comparing the case being reviewed with other cases. *See State v. Bland*, 958 S.W.2d at 668.

When we conduct this comparison with regard to the nature of the crime, we generally consider "(1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims." *State v. Rimmer*, 250 S.W.3d at 35; *see also State v. Rollins*, 188 S.W.3d at 575. With regard to the defendant, we generally compare the defendant's "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." *State v. Rimmer*, 250 S.W.3d at 35; *see also State v. Rollins*, 188 S.W.3d at 575.

We turn first to the nature of Mr. Banks's offense. Several days before Mr. Banks shot Mr. Atilebawi and then shot and killed Mr. Al-Maily, he formulated a plan with Mr. Hilliard to extract revenge on Mr. Atilebawi for conduct that had allegedly occurred almost one year earlier. He obtained a firearm from Mr. Hilliard and then waited for the opportunity to strike.

This opportunity came during the early morning hours of September 16, 2002 when Mr. Banks went to Mr. Atilebawi's home for the purpose of seeking revenge. The fact that Mr. Al-Maily was visiting Mr. Atilebawi did not deter Mr. Banks. Carrying out the plan he had devised with Mr. Hilliard, Mr. Banks shot Mr. Atilebawi four times and then tried to conceal his body. After shooting Mr. Atilebawi, Mr. Banks robbed Mr. Al-Maily and then ordered him to lie face down on the floor

of Mr. Atilebawi's bedroom.  Mr. Al-Maily did not resist.  After looting Mr. Atilebawi's house and loading the stolen personal property into a stolen Jeep Cherokee, Mr. Banks calmly and deliberately returned to Mr. Atilebawi's house, walked to Mr. Atilebawi's bedroom where Mr. Al-Maily was lying on the floor, and fatally shot Mr. Al-Maily in the back of the head.  Mr. Banks and Mr. Hilliard then left the scene of their crimes with the stolen property and the stolen automobiles.  Later that morning, apparently believing that both Mr. Atilebawi and Mr. Al-Maily were dead, Mr. Banks went on a spending spree with the money he had stolen from Messrs. Atilebawi and Al-Maily.

Mr. Banks had no personal animosity towards Mr. Al-Maily.  In fact, he characterized their relationship as friendly.  Shooting Mr. Al-Maily was not part of Mr. Banks's plan of revenge against Mr. Atilebawi.  Neither was it necessary to commit the offense, because Mr. Al-Maily cooperated fully with Mr. Banks during the robbery and offered no resistance whatsoever to either Mr. Banks or Mr. Hilliard.  Mr. Banks shot Mr. Al-Maily in the back of the head because he did not want to leave behind any live witnesses to his crimes.

We now turn to Mr. Banks himself.  While he opted not to testify on his own behalf during the sentencing phase, he called eleven mitigation witnesses.  These witnesses presented a positive and sympathetic image of Mr. Banks.  An implicit, and at times explicit, undercurrent of much of the testimony focused on the fact that Mr. Banks was only nineteen years old when he murdered Mr. Al-Maily.

Mr. Banks was part of a large family that faced significant social and financial challenges.  Despite the lengthy periods when his mother was in custody, he had a close relationship with his mother and received support from his grandmother, his older siblings, and members of his church.  While many of his family and friends saw Mr. Banks's soft-hearted and gentle side, Mr. Banks became capable of resorting to cruelty and violence.  By the time he murdered Mr. Al-Maily, he had been convicted of assault, battery, and domestic violence.  He did not tell his former girlfriend that he was HIV-positive, and he pointed a gun to her stomach when she was eight months pregnant.

We find that the death sentence, as applied to Mr. Banks in this case, is neither excessive nor disproportionate when compared to defendants in other cases.  For example, in *State v. Thacker* this Court expressly noted that "[w]e have upheld the death penalty in several similar cases where the defendant stole from the victims and committed murder to avoid arrest or prosecution."  *State v. Thacker*, 164 S.W.3d at 233.  Additionally, in *State v. Davis* we observed that we have "frequently upheld the death penalty in first degree murder cases involving shooting offenses committed in the course of a robbery or other felony."  *State v. Davis*, 141 S.W.3d at 621.

The following are among the cases in which this Court determined that application of the death penalty was not disproportionate in light of other similar circumstances.  In *State v. Thacker*, the defendant stabbed a wrecker driver who discovered that the defendant was using a stolen credit card.  The defendant later returned to conceal the body and to steal the victim's credit cards and cash.  *State v. Thacker*, 164 S.W.3d at 233.  In *State v. Reid*, the defendant shot and killed two unresisting employees while they were lying face down on the floor as part of a planned and premeditated robbery in order to avoid arrest or prosecution.  *State v. Reid*, 91 S.W.3d at 287.  In *State v. Sims*, the defendant shot the victim in the back of head during a burglary of the victim's home in order to

prevent identification. *State v. Sims*, 45 S.W.3d 1, 19 (Tenn. 2001). In *State v. Chalmers*, the Court upheld a death sentence where a defendant shot the victim five times as part of a robbery. *State v. Chalmers*, 28 S.W.3d 913, 915, 919 (Tenn. 2000). Finally, in *State v. King*, the Court upheld the conviction of a defendant who fatally shot a tavern owner who was not resisting at the time. *State v. King*, 694 S.W.2d 941, 943, 947 (Tenn. 1985).

We have also concluded that the mitigating circumstances in this case do not carry a disproportionately heavier weight than the mitigating circumstances in other cases in which the death penalty has been approved. The death penalty has been found proportional in a number of cases involving defendants who were as young as or younger than Mr. Banks when they murdered their victims. *State v. Davis*, 141 S.W.3d at 621-22 (eighteen-year-old defendant); *State v. Berry*, 141 S.W.3d at 571-72 (nineteen-year-old defendant); *State v. Pike*, 978 S.W.2d at 922-23 (eighteen-year-old defendant). Application of the death penalty has also been found not to be excessive in cases where the defendant experienced a difficult family life with parents in prison or otherwise absent, resulting in being raised with and by siblings and a grandmother. *State v. Davis*, 141 S.W.3d at 621-22; *State v. Berry*, 141 S.W.3d at 571. In terms of being a model prisoner, this Court has found evidence of being a model inmate, including being a positive uplifting member to the prisoner community, not to render application of the death penalty disproportionate. *State v. Austin,* 87 S.W.3d 447, 457-58 (Tenn. 2002). Nor has suffering from disease or maintaining close contact with family members been sufficient to render a death sentence excessive. *State v. Austin*, 87 S.W.3d at 458.

Considering the aggravating and mitigating circumstances in this case in light of all the evidence in this case, we find that Mr. Banks's conviction and sentence are not "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." *State v. Thacker*, 164 S.W.3d at 233 (quoting *State v. Bland*, 958 S.W.2d at 668); *State v. Godsey*, 60 S.W.3d at 782. Accordingly, we find the application of the death sentence in this case to be neither disproportionate nor excessive.

## XXI.

In summary, we have concluded that the Court of Criminal Appeals dealt correctly with regard to all the issues raised by Mr. Banks on this appeal except the trial court's submission of the Tenn. Code Ann. § 39-13-204(i)(6) aggravating factor to the jury. We have determined that the Court of Criminal Appeals erred by concluding that Tenn. Code Ann. § 39-13-204(i)(6) was not supported by sufficient evidence. Therefore, we reverse the Court of Criminal Appeals's disposition of that issue, but affirm the judgment of the Court of Criminal Appeals in all other respects.

Mr. Banks's sentence of death shall be carried out on December 9, 2009, unless otherwise ordered by this Court or other proper authority. It appearing that Mr. Banks is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
WILLIAM C. KOCH, JR., JUSTICE

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 10, 2007 Session

STATE OF TENNESSEE v. DEVIN BANKS

Direct Appeal from the Criminal Court for Shelby County
No. 03-01956    Joseph B. Dailey, Judge

No. W2005-02213-CCA-R3-DD  - Filed July 6, 2007

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

DAVID G. HAYES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Robert Jones, Shelby County Public Defender; Phyllis Aluko and Tony Brayton, Assistant Public Defenders (on appeal); Kathy Kent and Latonya Burrow, Assistant Public Defenders (at trial), Memphis, Tennessee, for the Appellant, Devin Banks.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael Moore, Solicitor General; Clarence Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General, Stacy McEndree, Assistant District Attorney General, and Karen Cook, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

[Section III]

**Failure to Charge Aggravating Circumstances in Indictment**

The Appellant asserts that the "imposition of the death penalty . . . violated due process of law because the aggravating circumstances were not set forth in the indictment." In this regard, he contends that "[a]ny fact that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt in order to satisfy the 5th Amendment's Due Process Clause and the 6th Amendment's notice and jury trial guarantees." With reliance upon *Apprendi v. New Jersey* and *Ring v. Arizona*, the Appellant submits that he was denied due process of law because the indictment returned by the grand jury did not include facts that would qualify him for the death penalty. In other words, he maintains that first degree murder is not a capital offense unless accompanied by aggravating factors. In order to elevate the crime to capital

murder, he alleges that the indictment must include language of the statutory aggravating circumstance(s).

The Tennessee Supreme Court has consistently rejected this argument by holding that aggravating circumstances need not be pled in the indictment. *State v. Reid*, 164 S.W.3d 286, 312 (2005); *Leach*, 148 S.W.3d at 59; *Berry*, 141 S.W.3d at 562; *State v. Holton*, 126 S.W.3d 845, 863 (Tenn. 2004); *State v. Dellinger*, 79 S.W.3d 458, 467 (Tenn. 2002). Our supreme court explained, "[t]he focus in *Apprendi*, *Ring*, and *Blakely* was on the Sixth Amendment right to trial by jury," and "the Court expressly declined to impose the Fifth Amendment right to presentment or grand jury indictment upon the States." *Berry*, 141 S.W.3d at 560. The Appellant is not entitled to relief on this issue.

[Section IV]

**Introduction of Photograph of the Victim**

During the testimony of Leonard Porter, a criminal investigator for the District Attorney General's Office, the prosecutor moved to admit a photograph of Atilebawi's injuries. The photograph, taken the week of the trial, depicted the right side of the victim's head and showed a large scar beginning at his forehead and continuing to the back of his head. The prosecutor stated that introduction of the photograph was relevant to "show all of these elements of the criminal attempt murder in the first degree. . . ." She further explained that no photographs of Atilebawi's injuries were taken at either "the crime scene or the hospital because they were trying to save his life. . . ." The Appellant objected stating that the victim had testified in person and that the photograph failed to prove any element of the crime. The trial court made the following ruling regarding the admission of the photograph:

> Well, my response to all of what all of you have said would be that as to relevance, it's very relevant. I mean, there is no question it was relevant. It shows the horrific nature of the severe injury that this man sustained, and it tends to corroborate what he testified to and what the doctor from The Med testified to.
>
> It's not prejudicial in that it doesn't show – it's not gory or bloody, and the jury saw him when he was in here yesterday and saw essentially the same injury. The only – I think the only plausible argument against allowing it in would be that it would be cumulative. The victim was in here yesterday.
>
> But I think that the State's burden to prove their case, I think gives them the right to introduce one photograph. They're not asking to introduce ten or [twenty] but to introduce one photograph that can be shown to the jury to corroborate the injuries that were testified to by the victim himself and by the doctor from The Med . . . [t]o show the injuries in general. To show that this man was severely injured by the

gunshot wounds to the back of the head, that half his head was blown off to show all of those things of course.

The trial court continued:

> . . . It is relevant and it's not prejudicial. It is perhaps somewhat cumulative but that – for example, had the State offered it into evidence when this victim was on the stand, I would have let them introduce it at that time because I think it's fair to allow at least one photograph of injuries, even though the person is sitting here live at this point in time, to document the record, to remind the jury later in the trial, at closing argument, during deliberations, that this is what this man looks like so that there is an actual photograph of it.
>
> Photographs are always by their nature cumulative to some extent. By definition, a photograph is going to be cumulative of something else. You can always have a person come in and testify to what a photograph otherwise depicts. . . .
>
> . . . And a photograph will provide [the jury] with that documented evidence that they can look at of injuries that they saw in person four or five days earlier. . . .

On appeal, the Appellant contends that the trial court erred in permitting the introduction of the photograph of the surviving victim, arguing that the trial court should have excluded the photograph because of the inevitable danger of unfair prejudice. Additionally, he asserts that the photograph exaggerated the victim's injuries and was irrelevant, as the photograph was taken years after the incident. Finally, the Appellant contends that, since the jury had already seen Atilebawi's injuries during his testimony at trial, the admission of the photograph was prejudicially cumulative. The State responds that the trial court's ruling was proper. Specifically, the State contends that the photograph was relevant to establish the Appellant's intent to murder Atilebawi and that it establishes that Atilebawi suffered serious bodily injury. Both elements are necessary to support convictions of attempted first degree murder and especially aggravated robbery. *See* T.C.A. § 39-13-202, -403. The State also contends that the photograph illustrated the testimony of Dr. Timmons and Atilebawi.

The admission of photographs is generally discretionary with the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). However, a photograph must be relevant to an issue that the jury must decide before it may be admitted into evidence. *State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998), *cert. denied*, 526 U.S. 1071, 119 S. Ct. 1467 (1999); *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); *see also* Tenn. R. Evid. 401, 402. Evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. *Vann*, 976 S.W.2d at 102-03; *see also* Tenn. R. Evid. 403

("[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

While it can be said that photographs of crime victims who suffer serious bodily injury are prejudicial by their very nature, a prejudicial photograph is not *per se* excludable. What is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. *Banks*, 564 S.W.2d at 951.

The trial court determined that the photograph was relevant and not prejudicial. We agree that the photograph was relevant to supplement the testimony of Dr. Timmons, as well as that of the victim himself. *See State v. Cole*, 155 S.W.3d 885, 913 (Tenn. 2005) (Appendix), *cert. denied*, 546 U.S. 829, 126 S. Ct. 47 (2005). We also agree that the trial court's acknowledgment of the need to preserve a record for the jury is accurate. Additionally, the photograph in question is not particularly gruesome. Thus, we conclude that the probative value of the photograph is not outweighed by its prejudicial effect, and the trial court did not abuse its discretion in allowing its admission. Further, it does not affirmatively appear that the "admission of the photograph[] has affected the results of the trial." *See Banks*, 564 S.W.2d at 953. The Appellant is not entitled to relief on this issue.

[Section V]

**Admission of the Appellant's Statement**

The Appellant next argues that the trial court erred in permitting introduction of statements made by the Appellant without first ruling on the Appellant's motion to suppress those statements. The State responds that the issue is waived because the Appellant failed to pursue the motion to suppress.

The record before this court reflects that the Appellant filed a motion to suppress his statements on July 16, 2003, alleging that his statements were involuntarily given as he was under duress at the time the statements were made. A hearing was conducted on July 25, 2003, during which time the Appellant requested and was granted a continuance until October 31, 2003. As the State correctly asserts, the record is silent as to whether the Appellant actively pursued the motion to suppress after this point. The record does indicate that on April 4, 2005, before voir dire of the jury panel commenced, the Appellant's counsel made the following remarks:

> Judge, I looked through the court jacket this morning, making sure since I was not on this case originally or at the time the motions were heard and I believe that all motions that have been filed have been discussed and ruled upon except for the 608, 609 motion that Your Honor took under advisement.[2]

---

[2]It is undisputed that, during the course of the Appellant's representation, certain reassignments in the Public Defender's Office resulted in Attorney Thackery being relieved from this case. Attorney White was appointed in her

(continued...)

During the State's case-in-chief, the Appellant's statements to law enforcement officers were admitted without any objection by the Appellant. Additionally, the Appellant, in his motion for new trial, raised the issue of whether the trial court erred in denying the motion to suppress, supporting the conclusion that the motion was in fact denied.

It is clear from the record before this court that, at the trial level, the Appellant proceeded under the assumption that the trial court had denied his motion to suppress. The Appellant, however, now maintains on appeal that he did not abandon the suppression issue. He adds that the fact that the trial court failed to state its findings on the record violated his constitutional rights to due process and to a fair jury trial, in addition to violating Tenn. R. Crim. P. 12(e).

From the actions of the parties and the trial court during the trial, including the failure of the Appellant to object to the introduction of the statements, it appears that all parties believed that the motion to suppress had been denied. Most notably, the trial court's admission of the statements during the trial suggests that the trial court was under the assumption that it had overruled the Appellant's motion. While the record presently before this court does not contain an order of the trial court reflecting its ruling upon the motion, we cannot conclude that its absence is dispositive. It is the burden of the Appellant to prepare a full and complete record for appellate review. *See* Tenn. R. App. P. 24(b). Moreover, the record clearly reflects that no objection was made by the Appellant to the admission of his statements at trial.

Even assuming for argument's sake that no ruling was ever made by the trial court, it was the Appellant who failed to obtain a ruling on that motion and failed to object when the evidence was introduced at trial. Accordingly, we agree with the State that the Appellant has abandoned the motion by failing to call to the trial court's attention the lack of a ruling on his suppression motion and by failing to object to the admission of the statements at trial. *See* Tenn. R. App. P. 36(a). If a motion is not acted upon, the litigant should renew it. "He may not lull the judge into thinking that it has been abandoned and then, after he has lost, pull a rabbit out of his pocket in the form of a forgotten motion." *United States v. Taglia*, 922 F.2d 413, 416-17 (7th Cir.), *cert. denied*, 500 U.S. 927, 111 S. Ct. 2040 (1991). As noted, the Appellant failed to renew his motion or ask for a ruling prior to voir dire. Later, when the State sought introduction of his statements, the Appellant remained silent and made no objection.

A similar issue was addressed by the Court of Appeals in *Grandstaff v. Hawks*, 36 S.W.3d 482 (Tenn. Ct. App. 2000). In *Grandstaff*, the trial court did not unequivocally overrule a motion in limine. The Court of Appeals determined that the motion in limine should have been renewed by objection and that the failure to renew the motion in limine had waived the issue. In reaching this conclusion, the Court of Appeals held:

> Objections to the introduction of evidence must be timely and specific. See *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702 (Tenn.

[2](...continued)
place. Prior to trial, Attorney White was relieved, resulting in the appointment of Attorney Kent.

-70-

Ct. App. 1999). An evidentiary objection will be considered timely either if it is made in a motion in limine or if it is made at the time the objectionable evidence is about to be introduced. *See Wright v. United Servs. Auto. Ass'n*, 789 S.W.2d 911, 914 (Tenn. Ct. App. 1990). A party who files an unsuccessful motion in limine need not renew the motion when the evidence is introduced as long as the trial court "clearly and definitively" overruled the motion in limine when it was made. *See State v. Brobeck*, 751 S.W.2d 828, 833-34 (Tenn. 1988); *State v. McGhee*, 746 S.W.2d 460, 462 (Tenn. 1988); *Wright v. United Servs. Auto. Ass'n*, 789 S.W.2d at 914. If, however, the trial court has not "clearly and definitively" acted on the motion, the moving party must renew the motion contemporaneously with the introduction of the objectionable evidence. Failure to renew the motion will preclude the moving party from taking issue on appeal with the admission of the evidence.

*Grandstaff,* 36 S.W.3d at 488.

Tennessee law is well-established that a party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal. *See* Tenn. R. App. P. 36(a). Moreover, if waived, this court will not consider the issue on appeal unless it is clear from the record that plain error was committed.

The motion to suppress filed by the Appellant on July 15, 2003, presented two allegations in support of his contention that the statements were taken in violation of his constitutional rights, namely that:

1. The [Appellant] did not freely, knowingly and voluntarily give said statements.
2. The [Appellant] made said statements while under duress.

No additional facts or argument were presented in support of the motion. At the July 25, 2003 motion to suppress hearing, Sergeant Mark Miller testified that the Appellant was advised of his rights and signed a waiver of rights form. The Appellant informed Sergeant Miller that he had an eleventh grade education. Sergeant Miller stated that the Appellant understood English and could read and write. In addition to the written waiver, the Appellant verbally indicated that he understood and waived his constitutional rights. Sergeant Miller testified that, at no time, did he threaten, coerce, or make promises to the Appellant.

Sergeant James Fitzpatrick testified that, one day after the Appellant's initial statement, the Appellant informed law enforcement officials that he wanted to change some facts related in his initial statement. Sergeant Fitzpatrick permitted the Appellant to make corrections to the statement. Sergeant Fitzpatrick observed that the Appellant had no problems communicating and appeared to be of sound mind. The Appellant never requested an attorney. Sergeant Fitzpatrick testified that, at no time, did he threaten, coerce, or make promises to the Appellant. He also recalled that the

Appellant was permitted to use the restroom during the interview and that the Appellant stopped to eat on two occasions.

Inherent in the admissibility of the written statement is that the statement was voluntarily given by a defendant knowledgeable of his constitutional rights and accompanied by a valid and knowing waiver of those rights. *State v. Berry*, 141 S.W.3d 549, 577 (Tenn. 2004) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 1624 (1966); *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992), *cert. dismissed*, 510 U.S. 124, 114 S. Ct. 651 (1993)). In determining the admissibility of a confession, the particular circumstances of each case must be examined as a whole. *Berry*, 141 S.W.3d at 577 (citing *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996)). A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. *Id*. (citations omitted). The primary consideration in determining the admissibility of the evidence is whether the confession is an act of free will. *Id*. at 578 (citing *State v. Chandler*, 547 S.W.2d 918, 920 (Tenn. 1977)). A confession is not voluntary when "the behavior of the state's law enforcement officials was such as to overbear" the will of an accused and "bring about confessions not freely self-determined." *Id*. (citing *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980)).

The testimony revealed that the Appellant's communication skills appeared adequate and that he was capable of reading, writing, and comprehension. The Appellant was advised of his constitutional rights and, without coercion or force, voluntarily waived his rights and provided an inculpatory statement. Neither officer indicated that the Appellant was under duress at the time he made his two statements. The officers provided the Appellant with food and restroom breaks during the interview process, and the Appellant never asked for an attorney. Therefore, we conclude that the Appellant knowingly waived his Miranda rights and voluntarily provided the statements to the police. Thus, the Appellant is not entitled to relief on this issue.

[Section XI]

**Victim Impact Jury Instruction was Coercive**

The Appellant next contends that "[t]he jury instructions given by the trial judge with respect to the jury's consideration of victim impact evidence constituted a coercive instruction." In instructing the jury, the trial court provided the following instruction as to victim impact evidence:

> The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological or physical effects of the victim's death on the members of the victim's immediate family and close friends. You may consider this evidence in determining an appropriate punishment.
>
> However, your consideration must be limited to a rational inquiry into the culpability of the [Appellant], not an emotional response to the evidence. Victim impact evidence is not the same as an aggravating

circumstance. Proof of an adverse impact on the victim's family or close friends is not proof of an aggravating circumstance. Introduction of victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt to you at least one aggravating circumstance which has been alleged.

You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence and find that the aggravating circumstance or circumstances found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.

The Appellant, relying upon *Johnson v. Hardin*, 926 S.W.2d 236, 242 (Tenn. 1996), asserts that the trial court's instruction "amounts to an undue intrusion into the exclusive province of the jury." He adds that "there is a reasonable probability that the instruction coerced a finding by the jury that the aggravating circumstances outweighed the mitigating circumstances because to find otherwise would require the jury to ignore the emotional victim impact evidence presented by the State." The Appellant's reliance upon *Johnson* is misplaced because in *Johnson* our supreme court addressed the issue of the trial court's deliverance of a "dynamite charge" to a deadlocked jury. The instruction in *Johnson* "raised [to the deadlocked jury] the specter of the time, effort, and money that a new trial would entail." *Johnson*, 926 S.W.2d at 243. The charge suggested that the jurors had a duty to agree. In this regard, our supreme court held "[n]othing should be done or said to a juror which can in any manner be taken by that juror to indicate that he or she should abandon an honestly held conviction in order to reach a verdict so that time and money will be saved." *Id.* (quoting *Bass v. Barksdale*, 671 S.W.2d 476, 486 (Tenn. Crim. App. 1984). Such a situation is not presently before the court, as the factual circumstances in Johnson are clearly distinguishable from those in the present case.

In fact, the instruction provided to the jury in the present case was recommended by our supreme court in *State v. Nesbit*, 978 S.W.2d 872, 892 (Tenn. 1998), and was again approved in *State v. Reid*, 91 S.W.3d 247, 283 (Tenn. 2002). *See also State v. Riels*, 216 S.W.3d 737 (Tenn. 2007); *Reid*, 164 S.W.3d at 336-37 (Appendix); *Cole*, 155 S.W.3d at 914 (approving *Nesbit* victim impact instruction). Moreover, in *Reid*, our supreme court specifically noted that any contradiction arising between the instruction and the statute inured to the benefit of the defendant and, thus, should not entitle a defendant to relief. *Reid*, 91 S.W.3d at 283. Accordingly, the Appellant is not entitled to relief on this issue.